1  ERIC D. CHAN (State Bar No. 253082)
   **ATHENE LAW, LLP**
2  10866 Washington Blvd., #142
   Culver City, CA 90232-3610
3  Telephone: (310) 913-4013
4  E-mail: eric@athenelaw.com
   Attorneys for Plaintiff THE REGENTS OF
5  THE UNIVERSITY OF CALIFORNIA on
   behalf of THE UNIVERSITY OF
6  CALIFORNIA, DAVIS MEDICAL CENTER

7

8

9              **IN THE UNITED STATES DISTRICT COURT FOR THE**

10         **EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

11

12  THE REGENTS OF THE UNIVERSITY OF          Case No.:    1:23-at-313
    CALIFORNIA, a California Public Trust
13  Corporation, on behalf of THE
    UNIVERSITY OF CALIFORNIA, DAVIS
14  MEDICAL CENTER,                           **COMPLAINT FOR:**

15              Plaintiff,                     **(1) BENEFITS UNDER SECTION
                                                   502(a)(1)(B) OF THE EMPLOYEE
16         vs.                                     RETIREMENT INCOME
                                                   SECURITY ACT (ERISA)**
17
    THE CHEFS' WAREHOUSE, INC.               **(2) AFFORDABLE CARE ACT
18  EMPLOYEE BENEFIT PLAN, THE CHEFS'            SECTION 2707(b) (OUT OF
    WAREHOUSE, INC., a Delaware corporation,     POCKET MAXIMUM), VIA ERISA
19  and DOES 1-20, inclusive;                     SECTION 502(a)(1)(B)**

20              Defendants.

21

22

23

24

25

26

27

28

Plaintiff, the Regents of the University Of California on behalf of the University of California, Davis Medical Center ("UC Davis Medical Center," "Plaintiff," or "the Hospital") complains and alleges:

## THE PARTIES

1.      Plaintiff UC Davis Medical Center is a nationally recognized, 646-bed academic medical center. The Hospital has been ranked as the #1 hospital in the Sacramento area for 2022-2023 by US News & World Report. It offers specialty care in 150 fields and is nationally ranked in nine specialties, including cancer care, cardiology & heart surgery, diabetes & endocrinologist, ear, nose & throat, geriatrics, neurology and neurosurgery, obstetrics & gynecology, orthopedics, and pulmonology & lung surgery.[1]

2.      On information and belief, Defendant The Chefs' Warehouse, Inc. is a Delaware corporation that does business in the Sacramento, CA area.

3.      On information and belief, Defendant The Chefs' Warehouse, Inc. Employee Benefit Plan (the "Plan") is a self-funded group health plan governed by the Employment Retirement Income Security Act of 1974 (ERISA).

4.      The Plan is a proper defendant pursuant to ERISA section 502(d). 29 U.S.C. § 1132(d). Plaintiff is informed and believes that Defendant The Chefs' Warehouse, Inc. is the sponsor of the Plan, and is also the Plan Administrator as that term is understood under ERISA.

5.      The true names and capacities of the defendants sued herein as DOES are unknown to Hospital at this time, and Hospital therefore sues such defendants by such fictitious names. Hospital is informed and believe that the DOES are those individuals, corporations and/or businesses or other entities that are also in some fashion legally responsible for the actions, events and circumstances complained of herein, were the agents, representatives, or employees of the other defendants, and may be financially responsible to Hospital for the services it has provided to the Patient. The Complaint will be amended to allege the DOES' true names and capacities when they have been ascertained.

---

[1] UC Davis Health website, Ranked Among the Nation's Best, https://health.ucdavis.edu/discovering-healthy/recognitions/ (last visited April 3, 2022).

1    6.    Together, The Chefs' Warehouse, Inc., The Chefs' Warehouse, Inc. Employee

2    Benefit Plan, and DOES 1-20 are referred to herein as "Defendants."

3    **JURISDICTION AND VENUE**

4    7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

5    § 1331, because the action arises under the laws of the United States; and pursuant to 29 U.S.C.

6    § 1132(e)(1), because the action seeks to enforce rights under ERISA.

7    8.    The Sacramento Division of the United States District Court for the Eastern District

8    of California is the appropriate venue for the filing of this case pursuant to Eastern District Local

9    Rule 120(d), because a substantial part of the events or omissions that give rise to UC Davis

10   Medical Center's claims occurred in Sacramento County.

11   **FACTUAL ALLEGATIONS**

12   9.    Plaintiff UC Davis Medical Center brings this lawsuit against the named

13   Defendants for failure to shield Patient A, a Plan beneficiary, from liability in excess of the cost-

14   sharing limits mandated by the Patient Protection and Affordable Care Act ("PPACA," the

15   "Affordable Care Act," or "ACA").

16   10.   Plaintiff brings this action pursuant to a validly executed assignment of benefits

17   from Patient A.

18   11.   In calendar year 2021, the federal government mandated that the federal maximum

19   annual limitation on out-of-pocket medical costs would be $8,550 for an individual.[2]  This

20   threshold is referred to throughout this Complaint as ACA's maximum annual out-of-pocket

21   limitation, or "MOOP" limit for short.

22   12.   Patient A presented to UC Davis Medical Center on or around August 3, 2021, and

23   was admitted to the hospital for five days.  Thereafter, Patient A received authorized

24   chemotherapy services from Plaintiff over the course of several months.

25   / / /

26   _____

27   [2] See Final Rule, Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment

28   Parameters for 2021; Notice Requirement for Non-Federal Governmental Plans, 85 Fed Reg. 29164, 29229 (May 14, 2020).

{00029803;1}

13.    The Plan paid only $74,512.84 of the $472,032.15 in total charges submitted by Plaintiffs. This represents just 18.7% of the total charges for Patient A's care.

14.    Defendants' decision rendered Patient A liable to Plaintiff for the unpaid balance for the care rendered by Plaintiff in a total amount of $397,519.31.

15.    The Plan covers the full range of hospital benefits including inpatient hospitalization, and outpatient cancer care, which are known as Essential Health Benefits (EHBs).

16.    At the same time, however, the Plan provides no delivery system through which Plan beneficiaries could receive the aforementioned hospital benefits.

17.    Defendants chose to set up the Plan without any network of hospitals capable of furnishing the hospital inpatient, and outpatient cancer care that Patient A received.

18.    Under the Plan, there are no "in-network" hospitals and "out-of-network" hospitals.

19.    The Plan coupled this nonstandard design with fixed, indemnity-level benefits for hospital care, which resulted in the low level of payment described above.

20.    When Congress passed the ACA over twelve years ago, Congress outlawed indemnity policies, also known as "junk insurance," which limited payment to an adequate amount, such as $500 per day for hospital care.

21.    Defendants' payment methodology – which is based on what they describe as "allowable claim limits" – bears a striking resemblance to now-illegal junk insurance. As with junk insurance, the goal is clearly to avoid paying a fair amount for the medical care for beneficiaries like Patient A.

22.    By paying inadequate rates and foregoing a network of hospitals, Defendants expose their own employees and their families to potentially catastrophic liability – in  direct violation of longstanding ACA patient protections.  Defendants' strategy subverts the entire managed care system, which is built on networks of providers.  And it defeats ACA's overarching policy goal, which is to protect patients from excessive out-of-pocket costs, especially for medically necessary hospital care, including cancer care.

23.    Defendants had a clear legal obligation to ensure that Plan beneficiaries had adequate access to the hospital services that were supposedly covered under the Plan.

{00029803;1}

24.     Because Defendants chose not to establish a network of hospitals, ACA now obligates Defendants to pay for all of Patient A's uncompensated care above the annual MOOP limit for 2021.

25.     Over the past decade, three federal agencies – the United States Department of Health and Human Services ("HHS"), the United States Department of Labor, and the United States Department of Treasury (together, the "Agencies") – have issued joint regulatory guidance affirming Defendants' obligation to limit Patient A's financial liability.  The guidance requires that group health plans either utilize a network of providers or else put into place robust procedural protections.  Group plans that do neither are not considered to have established a network of providers for purposes of the annual MOOP threshold limitation.

26.     The Agencies provided guidance on this important ACA protection because of the significant risk that a plan that pays a fixed amount, but does not use a network of hospitals, may serve as a subterfuge for the imposition of otherwise prohibited limitations on coverage.

27.     Defendants therefore owe to Plaintiff the portion of the balance of $397,519.31 to Plaintiff that exceeds the $8,550 calendar year limit for 2021, along with appropriate interest.[3]  In the alternative, Plaintiff seeks to enforce the Plan's own Out-of-Pocket Expense Limit of $3,600 per calendar year, as set forth more fully in Section G below and the First Cause of Action.

**A. The Plan Covered Inpatient Hospitalization and Cancer Care, which are Essential Benefits under ACA**

28.     The Plan is self-funded, meaning that it is liable, dollar-for-dollar, for the direct healthcare costs of employees and their families who are covered under the Plan.  The Plan is not "insurance" within the meaning of the ERISA.  It is self-insured.

29.     The Plan covers the full range of facility benefits for beneficiaries and participants of the Plan, including hospital inpatient stays for serious illness and chemotherapy treatment – all of which were received by Patient A.

---

[3] Plaintiff is presently unaware whether Defendants assigned any cost sharing amounts to Patient A prior to when Patient A received services at UC Davis Medical Center during calendar year 2021. Plaintiff intends to seek such information in discovery.

{00029803;1}

30.    The October 1, 2020 Plan and Summary Plan Description for the Plan is attached hereto as **Exhibit A**.  The Plan's Schedule of Benefits begins on page 7.  It confirms that all  these categories of benefits were covered by the Plan.  (*Id*. at 10 ("Facility" benefits for "Hospital – Inpatient" at "100% after Deductible"); *id*. at 8 ("Facility" benefits for "Chemotherapy" at "100% after Deductible").)

31.    Each of these categories are Essential Health Benefits (EHBs) within the meaning of the Affordable Care Act.  *See* 42 U.S.C. § 18022(b) (PPACA Section 1302(b)).

32.    While self-funded group health plans are not obligated to cover all categories of EHBs, plans that do choose to cover EHBs are subject to ACA requirements, including the requirement that a patient not pay more than the annual MOOP threshold limit in a given calendar year.

**B.    The Plan Did Not Utilize a Network of Hospitals that Could Deliver the EHBs Covered By the Plan**

33.    Under the framework of modern managed healthcare, payors establish networks of healthcare providers to deliver covered health care benefits.

34.    Payors create networks by contracting with individual providers for agreed-upon reimbursement rates (i.e., rates that the provider agrees, contractually, to accept as "payment in full" (except for permitted copayments, deductibles and coinsurance).

35.    Generally speaking, payors that participate in network arrangements are required to establish and maintain adequate networks of providers who can care for their members and insureds in a given geographic area.

36.    A network of hospitals is especially important to ensure that members and insureds have reasonable and timely access to emergency and inpatient hospitalization services for serious illnesses.

37.    UC Davis Medical Center participates in many networks of hospitals that are maintained by established health insurers such as United Healthcare, Aetna, Blue Shield, and Anthem Blue Cross.

/ / /

38.     Had Defendants chosen to contract with one or more major health insurers to administer its group health plan – as most large, reputable employers do – then Plaintiff would most likely have been in-network with the Defendants, and this dispute would not have arisen.

39.     The Plan, here, however, does not utilize a network of hospitals.

40.     The governing Plan document itself confirms that the Plan was not designed to utilize a network of hospitals.  While the Plan does utilize a network of individual physicians, it has no network of hospital facilities.

41.     The Plan's Definitions section defines a "Nonpreferred Provider" as "A *physician* or other **individual** healthcare provider who does not have an agreement in effect with the *Preferred Provider Organization* at the time services are rendered."  (Ex. A at 91) (underline emphasis added).  Put another way, a nonpreferred provider with respect to the Plan is a physician who is not in the Plan's network.

42.     Next, the "Preferred Provider Organization" is defined as an organization that "selects and contracts with certain professional providers . . ."  (*Id*. at 92.)

43.     Preferred Providers (those within the Plan's network) belong to a "*Preferred Provider Organization (PPO)"* that "accepts a *negotiated rate* for services rendered to *covered persons*."  (*Id*.)  "In turn, the PPO has an agreement with the *plan administrator* or *claims processor* to allow access to *negotiated rates* for services rendered to *covered persons*. The PPO's name and/or logo is shown on the front of the *covered person*'s ID card."  (*Id*.)

44.     There is also section of the governing Plan document entitled "Preferred Provider or Nonpreferred Provider."  The Plan explains that the terms "Preferred Provider" and "Nonpreferred Provider" – e.g., providers that have or do not have an agreement to accept a negotiated rate – "[a]ppl[y] to *professional providers* only."  (Ex. A at 15 (emphasis in original).)

45.     The word "professional" is significant: it refers to the healthcare services rendered by physicians or other licensed individuals.

46.     The term "facility," in contrast, is used to describe the separate services rendered by a hospital or an ambulatory surgery center.

/ / /

47.  It is customary for professional services to be billed separately from facility services, even for the same patient encounter (such as a visit to the emergency room.)  In fact, the health care industry uses different billing forms for professional and facility services.  Professional services are typically billed on  HCFA-1500 billing forms, whereas facility services are billed on UB-04 billing forms.

48.   Patient A's Member ID card, which was imaged at the time of patient registration, confirms that the only Preferred Provider Organization used by the Plan is MultiPlan.  Under the MultiPlan logo are the words "Practitioner & Ancillary Only."  This phrase indicates that the MultiPlan PPO network utilized by the Plan only covers  practitioners, e.g., physicians and other individual professionals.

49.  The MultiPlan PPO network used by the Plan does not extend to hospitals.  Hospitals are not considered "ancillary" providers or "physician" providers.  They are "facility" providers.

50.  The only other logo on the card (other than that of Trustmark, the Plan's claims administrator) is for a pharmacy network, US-Rx Care.



51.  MultiPlan also has a separate hospital network in which UC Davis Medical Center has agreed to participate. MultiPlan has an agreement to pay UC Davis Medical Center for hospital services at a substantial percentage of total charges.

52.  But the Plan does not utilize that hospital network, and if it did, it would have paid Plaintiff at its contracted MultiPlan rate.

53.  In addition, the Schedule of Benefits sets forth three distinct payment rates: for "Preferred Provider[s]," and "Nonpreferred Provider[s]," and for "Facilities." (Ex. A at 7-16.)

/ / /

54.     The term "preferred" is only used in conjunction with the term "provider," meaning physicians or other licensed individuals. There are no "preferred facilities" or "nonpreferred facilities," in contrast. There are simply "facilities."

55.     Because the Plan does not utilize any network of hospital facilities, there were no "network hospitals" and no "non-network hospitals."

56.     Any distinction between "network" hospitals and "non-network" hospitals was meaningless with respect to the Plan.

**C.    The Plan's So-Called "Claim Review And Audit Program" Routinely Leaves Patients With Large Unpaid Balances For Medical Care**

57.     Incident to its decision not to utilize a network of hospitals, the Plan implemented what it calls a "Claim Review and Audit Program."

58.     To be clear, the Plan did not actually do an "audit" of Plaintiffs' reimbursement claims, or any other hospital's claims.

59.     Rather, on information and belief, Defendants direct every bill submitted by any hospital to ELAP, a third part consultant hired by the Plan.  ELAP then "prices" the hospital bill. The "pricing" is predetermined based on certain "allowable claim limits" specified in the Plan document:

2.    Guidelines. The following guidelines will be used when determining allowable claim limits:
a.    Facilities. The allowable claim limit for claims by a facility, including but not limited to, hospitals, emergency and urgent care centers, rehabilitation and skilled nursing centers, and any other health care facility, shall be the greater of (I) 112% of the facility's most recent departmental cost ratio, reported to the Centers for Medicare and Medicaid Services ("CMS") and published in the American Hospital Directory as the "Medicare Cost Report" (the "CMS Cost Ratio"), or (II) the Medicare allowed amount for the services in the geographic area plus an additional 20%.

(Ex. A at 30.)

60.     In practice, Defendants "priced" most or all of Plaintiff's claims using option (I) described above, which is the cost-plus-12% methodology.

61.     Plaintiff never agreed to be subject to the Plan's pricing methodology. There was no agreement for services between Plaintiff and the Plan.  Plaintiff thus never agreed to discount its charges for the care rendered to Patient A.

{00029803;1}

62.     On information or belief, no other hospitals in the Sacramento geographic area – or indeed, anywhere – have ever agreed to accept the Plan's methodology as payment in full.

63.     After calculating extremely low reimbursement amounts – in this case, only 18.7% of Plaintiff's charges for care – Defendants assign artificially low co-payments, deductibles and co-insurance amounts (including for Patient A), based on a portion of the "allowable claim limits."

64.     This practice of calculating relatively small patient responsibility amounts is misleading, because it ignores the remaining balance of unpaid healthcare charges.  Here, that unpaid balance was the 81.3% of Patient A's total bill that exceeded the so-called "allowable claim limits."

65.     The large unpaid balance for the Hospital's services remains Patient A's responsibility.  Under the Plan's own terms, beneficiaries like Patient A "must pay" not only for "any normal cost-sharing features of the Plan, such as deductibles, coinsurance and copayments," but also "any amounts otherwise excluded or limited according to the terms of the Plan." (Ex. A at 30.)

66.     When Patient A came to UC Davis Medical Center for care, Patient A agreed to be personally liable for all amounts that the Plan did not pay.  Specifically, Patient A agreed to and signed an agreement containing the following language:

> **8. FINANCIAL AGREEMENT**: I agree to pay the Regents of the University of California for professional, hospital and clinic services, including UCDHS physician services, in accordance with the Charge Master in effect on the date of service. I also agree to pay for other professional services provided by other physicians at UCDHS. Should the account be referred to an attorney or collection agency for collection. I agree to be responsible for all collection fees (attorney's fees, costs and collection expenses) in addition to any other amounts due. Unpaid accounts referred to outside agencies for collection also bear interest at the then current legal rate.

67.     Defendants know Patient A is responsible for the unpaid balance.  That is why they (either directly or through consultants) hire aggressive "patient advocates" and law firms to fight health care providers who seek to collect their charges from patients.

/ / /

/ / /

/ / /

**D. Defendants Failed to Comply with a Key PPACA Protection: the Annual MOOP Threshold of $8,550 in Calendar Year 2021**

68.     One of the main goals of PPACA is to limit patients' out-of-pocket expenditures for key health care services, and thus imposes an annual maximum out-of-pocket limitation, known as the MOOP threshold.

69.     An individual patient cannot be liable for more than the MOOP threshold in any given calendar year for cost-sharing for EHBs. *See generally* 42 U.S.C. § 18022(c) (PPACA Section 1302(c)).

70.     The federal Agencies tasked with implementing and administering ACA have set the MOOP threshold for each year beginning in 2014. For instance, the MOOP threshold for an individual was $6,350 in calendar year 2014.[4] The threshold was set by the Agencies for each year thereafter, increasing slightly each year. Relevant here, the threshold was $8,550 for an individual in calendar year 2021.

71.     While the Agencies also established a separate MOOP threshold for families (under the unwieldy term "coverage other than self-only coverage"), it is the individual threshold that applies to Patient A.

72.     In a 2015 rulemaking, the Agencies clarified that a patient's cost sharing for EHBs "may never exceed the self-only annual limitation on cost sharing."[5]

73.     As a result of this clarification, an insurer or group health plan cannot "require any individual, including those with family coverage, to spend more than the individual out-of-pocket limit established under the Act." *Fisher v. Aetna Life Ins. Co*., No. 16-CV-144 (RJS), 2020 WL 5898788, at *4 (S.D.N.Y. Oct. 5, 2020) (emphasis added), aff'd, 32 F.4th 124 (2d Cir. 2022).

74.     As used in this context, the hospitalization and cancer services provided to Patient A were EHBs covered by the Plan.

---

[4] Patient Protection and Affordable Care Act; Exchange and Insurance Market Standards for 2015 and Beyond; Final Rule, 79 Fed. Reg. 30,240 (May 27, 2014).

[5] Patient Protection & Affordable Care Act; HHS Notice of Benefit & Payment Parameters for 2016, 80 Fed. Reg. 10,750, 10,824 (Feb. 27, 2015) (emphasis added).

{00029803;1}

75.     Defendants were therefore required by law to ensure that all EHB-related expenditures above the $8,550 threshold in calendar year 2021 were covered by the Plan.

**E. Because the Plan Chose Not to Utilize a Network of Hospitals, the *Entire Unpaid Balance* for Patient A's Care Counted Towards the $8,550 MOOP Threshold**

76.     PPACA Section 1302(c) mandates that patients' cost-sharing for EHBs must not exceed the annual MOOP threshold.  Section 1302(c)(3) states that "[t]he term cost-sharing <u>includes</u>—(i) deductibles, coinsurance, copayments, or similar charges; <u>and</u> (ii) <u>any other expenditure</u> required of an insured individual with respect to essential health benefits covered under the plan."  42 U.S.C. § 18022(c)(A) (emphasis added).

77.     Excluded from the statutory definition of "cost sharing" are "premiums," "balance billing amounts <u>for non-network providers</u>," and "spending for non-covered services."  *Id*. § 18022(c)(B) (emphasis added).

78.     Thus, balance billing amounts – such as the $397,519.31 owed by Patient A – must count towards the annual cost sharing (MOOP) threshold <u>unless</u> they are charged by "non-network providers."  The statutory definition of "cost sharing" is inclusive.  It excludes only the categories of expenses that are <u>not</u> included.

79.     There are, of course, no "non-network hospitals" when it comes to the Plan.

80.     The balance bills for the care that Plaintiff rendered to Patient A, thus, qualify as "cost sharing" under Section 1302(c)(3) and count towards the MOOP.

81.     This interpretation is confirmed by Section 1302(c)'s implementing regulation.  45 C.F.R. § 156.130.  Subsection (a) reiterates PPACA's annual limitation on cost-sharing.  Subsection (c) of the regulation confirms that plans <u>may</u> choose to utilize a network of providers, or it may choose not to.  But if a plan chooses not to use a network of providers, it cannot take advantage of the following "special rule":

> **<u>(c) Special rule for network plans</u>**. In the case of **<u>a plan using a network of providers</u>**, <u>cost sharing paid</u> by, or on behalf of, an enrollee <u>for benefits provided</u> **<u>outside of such network</u> *is not required to count*** toward the annual limitation on cost sharing (as defined in paragraph (a) of this section).  45 C.F.R. § 156.130(c) (emphasis added).

/ / /

{00029803;1}

45 C.F.R. § 156.130(c) (emphasis added); *accord* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016, 80 FR 10,750, 10,824.

82.     If a plan uses a network of providers (such as a network of hospitals), then balance billing amounts paid by a plan enrollee that were charged by providers "outside of such network" is not required to count towards the annual limitation on cost sharing (the MOOP limit).

83.     Conversely, if there is no network of hospitals, then care cannot be provided "outside of such network," for there is no network for a hospital to be "outside of."

84.     Consider a hypothetical plan that covers inpatient hospital care and acupuncture, but only offers a "network" consisting solely of acupuncturists.  That plan can be said to have a network of acupuncturists.  But the plan does not utilize a network of hospitals.   In this scenario, there are certainly "out-of-network" acupuncturists, but there are no "out-of-network" hospitals.

85.     In guidance dated February 20, 2013, the federal Agencies confirmed this view of what it means to utilize a "network" of hospitals or other providers.  *See* FAQs About Affordable Care Act Implementation (Part XII), Q3, available here.   The Agencies considered a hypothetical where a health plan is obligated to cover a service, but "does not have in its network a provider who can provide the particular service." There, the Agencies explained, the plan "must cover the item or service when performed by" providers not in its network.  (*Id*.)  This is because there is no network of providers capable of providing the service that must be covered.

86.     To take advantage of the "special rule" in section 156.130(c), then, it is not enough to have a network of physicians but not a network of hospitals, and the Plan must count all cost-sharing for EHBs provided by hospitals, including balance bills, towards the annual MOOP limitation.  It did not do so in the case of Patient A.

**F.   The Annual MOOP Requirement Applies to Self-Funded Plans**

87.     When Congress passed the Affordable Care Act, it ensured that this annual limitation on cost sharing applied to ERISA-governed group health plans.

88.     Section 2707 of the Public Health Service Act ("PHS Act") is captioned "Comprehensive health insurance coverage."  42 U.S.C. §300gg-6.  Section 2707 is found in title XXVII of the PHS Act. Subsection (b) of the statute provides:

*(b) Cost-sharing under group health plans*
A group health plan shall ensure that any annual cost-sharing
imposed under the plan does not exceed the limitations provided for
under paragraphs (1) and (2) of section 1302(c).

89.     Defendant The Chefs' Warehouse, Inc. Employee Benefit Plan is a group health plan within the meaning of ERISA and ACA.  *See* 42 U.S.C. § 300gg-91(a)(1).

90.     ACA directly amended ERISA itself, as well.  Section 715 of ERISA, (29 U.S.C. § 1185d), which was added by PPACA Section 1563(e), incorporates provisions of part A of title XXVII of the PHS Act into ERISA.  As noted above, Section 2707 is found in title XXVII, part A of the PHS Act.  Section 2707 therefore applies directly to self-funded ERISA plans. *See, e.g.*, *King v. Blue Cross & Blue Shield of Illinois*, 871 F.3d 730 (9th Cir. 2017) (confirming this analysis).

91.     Accordingly, Defendants were required to pay the entire unpaid balance for Patient A's care once the $8,550 MOOP threshold was met for calendar year 2021.

**G. The Plan's Express Terms Incorporate ACA's Statutory MOOP Requirements**

92.     Under a heading titled "Conformity with Statute(s)," the governing Plan document provides, "Any provision of the ***Plan*** which is in conflict with statutes which are applicable to the ***Plan*** is hereby amended to conform to the minimum requirements of said statute(s)."  (Ex. A at 75 (emphasis in original).)

93.     The Plan's provisions are in violation of the requirements of PPACA Section 1302 and PHS Act Section 2707.

94.     The Plan's Schedule of Benefits contains an Out-of-Pocket Expense Limit, described as "the most the covered person could pay in a year for covered services."  (Ex. A at 7.) The Out-of-Pocket Expense Limit is calculated on a calendar year basis.  (*Id*. ("Calendar Year: January 1 – December 31."))  However, the only out-of-pocket expenses that count towards the Out-of-Pocket Expense Limit are "deductible, coinsurance, copays, and prescription drug cost-share" amounts.  (*Id*.)  The Out-of-Pocket Expense Limit also states, "[t]he following charges do not apply to the out-of-pocket expense limit and are never paid at 100%: . . . "expenses in excess of ***allowable claim limit***."  (*Id*. (emphasis in original).)

95.     As previously discussed, the "allowable claim limit" is either 120% of Medicare rates or the hospital's costs plus 12%.

96.     The portion of a hospital's bill for covered EHB services that exceeds the "allowable claim limit" is also known as the balance bill, for which the patient remains responsible.  The Plan says beneficiaries "must pay for any normal cost-sharing features of the Plan, such as deductibles, coinsurance and copayments, **and any amounts otherwise excluded or limited according to the terms of the Plan**."  (Ex. A at 30 (emphasis added).)

97.     The Out-of-Pocket Expense Limit provision thus violates Section 1302 and Section 2707. It fails to count balance bills for hospital services towards the annual out-of-pocket limit. At the same time, the Plan explicitly leaves the patient liable for paying all balance bill amounts.

98.     The protection offered by the Plan's Out-of-Pocket Expense Limit is illusory.  The Out-of-Pocket Expense Limit provision under the Plan seems to offer an even more favorable annual maximum – $3,600 for an individual – than that imposed by the Agencies.  (Ex. A at 7.) But hospital balance bills are completely excluded.  Only the artificially low co-insurance, deductible and co-pay amounts determined by the Plan are included.  This violates the ACA statutory requirements.

99.     Accordingly, the Out-of-Pocket Expense Limit provision of the plan is automatically "amended to conform to the minimum requirements of" Sections 1302 and 2707. (Ex. A at 75.)

100.    Defendants must therefore ensure, by appropriate payments to Plaintiff, that Patient A is not liable for any more than the Plan's $3,600 individual Out-of-Pocket Expense Limit, including hospital balance bills.

**H.  Ten Years of Federal Guidance on Section 1302 and 2707 Further Confirm that Defendants Cannot be Considered to Have Utilized a Network of Hospitals**

101.    Beginning in 2013, the three federal Agencies issued extensive guidance confirming at Sections 1302 and 2707 apply to self-funded group health plans, including:

/ / /

/ / /

{00029803;1}

a.  FAQs About Affordable Care Act Implementation (Part XII), Q1 and Q2 (February 20, 2013), available here.[6]

b.  FAQs About Affordable Care Act Implementation (Part XVIII), Q2, Q3 and Q4 (January 9, 2014), available here.

c.  FAQs About Affordable Care Act Implementation (Part XIX), Q2 and preamble, and Q4 (May 2, 2014), available here.

d.  FAQs About Affordable Care Act Implementation (Part XXI) (October 10, 2014) (entire document), available here.

e.  FAQs About Affordable Care Act Implementation (Part 31), Q7 (April 20, 2016), available here.

f.  FAQs About Affordable Care Act Implementation (Part 55), Q5 (August 19, 2022), available here.

102.    The Agencies' extensive guidance (together, the "Guidance') is hereby incorporated by reference.

103.    As the Guidance above shows, the Agencies have taken a very hard look over the past decade at self-funded ERISA plans that do not include a network of hospitals, yet "pay[] a fixed amount" for patient care.  (FAQs Part XXI at 2.)

104.    The Agencies expressed concern that "such a pricing structure may be a subterfuge for the imposition of otherwise prohibited limitations on coverage, without ensuring access to quality care and an adequate network of providers."  (FAQs Part XIX, Q4; *see also* FAQs Part XXI (outlining key safeguards required to ensure the fixed benefit structure "does not function as a subterfuge"); FAQs Part 31, Q7 (reiterating "subterfuge" concern).

105.    After seeking comment from interested parties, the Agencies ultimately determined that plans that without a network of contracted providers have not "established a network" for purposes of PHS Act Section 2707(b) if they do not "us[e] a reasonable method" to ensure access and quality:

---

[6] Each of the Agencies promulgated identical versions of this regulatory guidance on their own websites. For consistency, all these links are to the versions issued by the Department of Labor.

Q7: If a non-grandfathered large group market or self-insured group health plan as a pricing structure in which the plan pays a fixed amount (sometimes called a reference price) for a particular procedure, but the plan does not ensure that participants have adequate access to quality providers that will accept the reference price as payment in full, <u>is the plan required to count an individual's out-of-pocket expenses for providers who do not accept the reference price toward the individual's MOOP limit</u>?

*Yes.* The Departments' previous guidance explained that, for purposes of PHS Act section 2707(b), a plan that utilizes a reference-based pricing design (or similar network design) may treat those providers that accept the reference-based price as the only in network providers and not count an individual's out-of-pocket expenses for services rendered by other providers towards the MOOP limit only if the plan is using a reasonable method to ensure adequate access to quality providers at the reference price. <u>A plan that merely establishes a reference price **without using a reasonable method** to ensure adequate access to quality providers at the reference price will not be considered to have established a network for purposes of PHS Act section 2707(b)</u>. . . .

(FAQs Part 31, Q7 (emphasis added).

106.    The requirements for establishing such a "reasonable method" are set forth in the Guidance, particularly FAQs Part XXI, and were not followed by the Plan.

**I.    Defendants Are Not Excused From Their Failure to Utilize a Network of Hospitals Because They Did Not Utilize a "Reasonable" Method, As Required by the Guidance**

107.    The Plan at issue did not employ any reasonable method to ensure that its "fixed" pricing methodology was not a subterfuge for the imposition of otherwise prohibited limitations on coverage.

108.    At the outset, the Guidance contemplates that plans may choose, for example, not to have a network of providers with respect to "a particular procedure" and pay a fixed amount just for that procedure. (FAQs, Part XXI.) The Plan's Claim Review and Audit Program, in contrast, applies indiscriminately, to any bill submitted by any hospital for any service.

109.    The Guidance also states that "[l]imiting or excluding cost-sharing from counting toward the MOOP . . . would not be considered reasonable with respect to emergency services" (FAQs Part 21) or subsequent post-stabilization, inpatient hospital services (FAQs Part 55, Q5.)

110.    Paying for such hospital services at a fixed price set by a plan without a network of hospitals would be unreasonable because consumers rarely have a choice with respect to when and where they go to the hospital for life-threatening illnesses.

{00029803;1}

111.    Here, however, Defendants applied its "allowable claim limits" methodology to the bills for inpatient hospitalization care for Patient A.

112.    In direct violation of the Guidance, the Plan failed to adopt any procedures to ensure that "an adequate number of providers" are willing to accept the Plan's fixed amount as payment in full.  (FAQs Part 21.)

113.    Plaintiff is informed and believes that Defendants conducted no "network adequacy" analysis whatsoever with respect to hospitals in the Sacramento geographic region before adopting the "allowable claim limits" for hospital care.

114.    In direct violation of the Guidance, the Plan failed to adopt procedures to ensure that any providers willing to accept the low prices paid by the plan "meet reasonable quality standards."  (*Id*.)

115.    In direct violation of the Guidance, the Plan failed to establish or maintain "an easily accessible exceptions process" to its fixed-price methodology.  (*Id*.)

116.    In direct violation of the Guidance, the Plan likewise failed to disclose to beneficiaries and participants:

- "[T]he pricing structure, including a list of services to which the pricing structure applies and the exceptions process" (*id*.);
- "A list of providers that will accept the [Plan's fixed payment] for each service" (*id*.);
- "A list of providers that will accept a negotiated price above the [Plan's fixed payment] for each service" (*id*.); and
- "Information on the process and underlying data used to ensure that an adequate number of providers accepting the reference price meet reasonable quality standards."  (*Id*.)

117.    Defendant Plan freely admits that it did not utilize a network of hospitals that could render the EHBs covered by the Plan.

118.    Defendants failed to comply with the Guidance.  Thus, the Plan was not otherwise excused under the Guidance from its obligation to maintain a network of hospitals.

{00029803;1}

119.    Defendants' practice of paying a fixed price for every conceivable hospital service regardless of access, choice, or quality is further evidence that Defendants used their pricing methodology as a subterfuge to avoid ACA's otherwise clear prohibitions on benefit limitations.

120.    The intent of Congress in passing the ACA was to outlaw "junk" insurance like the Plan.  During the legislative process that led up to the enactment of ACA, Congress received testimony from healthcare experts on the healthcare reforms they believed were needed in the commercial health care coverage market at the time.  *See generally Healthcare Reform Roundtable (Part I): Hearing Before the S. Comm. on Health, Education, Labor & Pensions,* 111th Cong. (2009) (statement of Jonathan Gruber, Ph.D of the Massachusetts Institute of Technology).

121.    In his testimony, Professor Jonathan Gruber urged Congress not only to abolish annual and lifetime limits on health benefits, but also to

> more broadly rule out 'mini-med' or 'indemnity' plans that don't necessarily include annual or lifetime limits, but instead impose a reimbursement schedule to the consumer which is well below the likely cost of the service. Plans which only cover, for example, $500/day towards the cost of a hospital stay place consumers at needless and unanticipated risk.

(*Id*. (emphasis added).)

122.    Congress took Professor Gruber's advice, and the ACA now prohibits indemnity-style, mini-med benefits with respect to group health plans and health insurers.

123.    Yet today, Defendants, through the Plan, pay all hospitals using a one-size-fits all reimbursement "formula" that mimics the "reimbursement schedule" or "indemnity" benefit structure outlawed by the ACA.

124.    By adopting a plan design with no network of hospitals and no procedural safeguards, Defendant engage in precisely the sort of "subterfuge" that the Agencies' Guidance sought to prevent.

**J.    Plaintiff Exhausted Its Administrative Remedies**

125.    Plaintiff pursued all levels of appeal that were available for each claim for the hospital services it rendered.

{00029803;1}

126.    Each appeal was met by a generic denial, upholding the Plan's decision.  Each of the appeals was denied without further payment.

127.    Plaintiff has exhausted all its administrative remedies under ERISA.

128.    Further appeals would have been entirely futile.  Without exception, each of Plaintiff's appeals was denied without additional payment.

129.    Moreover, because Defendants failed to follow ERISA claims regulations – which require that plan administrators provide the "specific reason or reasons for [each] adverse determination" of benefits – all appeals must be "deemed exhausted" within the meaning of 29 C.F.R. § 2650.503-1(l)(1).

**K.  The Purported One-Year Limitation Does Not Bar Suit**

130.    An obscure sentence buried deep within the 103-page Plan document states that any lawsuit against the Plan "must be filed within one (1) year from the date all claim review procedures provided for in this Plan Document have been exhausted." (Ex. A at 76.)  This statement is insufficiently disclosed and, under ERISA, not enforceable.

131.    "ERISA's central policy goal is to protect benefit plan participants 'by requiring the disclosure and reporting to participants and beneficiaries of financial and other information . . . and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." *King v. Blue Cross & Blue Shield of Illinois*, -- F.3d. --, No. 15-55880, 2017 WL 3928339 (9th Cir. Sept. 8, 2017).  To further this goal, ERISA requires that benefit plans provide participants with an SPD and a "summary of any material modification in the terms of the plan." *Id*. (citing 29 U.S.C. § 1022(a).)

132.    Section 1022 of ERISA requires that Summary Plan Description documents, like the ones at issue here, "shall be written in a manner calculated to be understood by the average plan participant."  29 U.S.C. § 1022(a).  The SPD must also "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  (*Id*.)

133.    The regulations implementing Section 1022 of ERISA unambiguously require that limitations and exclusions not be minimized or obscured:

General format.  The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries.  Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant.  <u>Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits.</u>  The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations.

29 C.F.R. § 2520.102-2(b) (emphasis added).

134.    The regulations only permit limitations and exclusions to be stated in a separate place from the benefits if the SPD expressly sets forth in the benefits section the specific page where the pertinent limitations and exclusions can be found.

135.    Here, the same document serves as the SPD and formal written document governing the Plan.  (Ex. A (title page) ("Plan Document and Summary plan Description").

136.    In *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1294 (9th Cir. 2014) the Ninth Circuit held that a time limitation on suit could not be enforced against a healthcare provider because it was located more than 30 pages after the SPD's benefit provisions, in violation of Section 1022(a).

137.    And in *King v. Blue Cross & Blue Shield of Illinois*, 871 F.3d 730, 741 (9th Cir. 2017), the Ninth Circuit determined that a lifetime limitation on benefits was rendered unenforceable for failure to comply with the same ERISA disclosure requirements.

138.    Here, the purported one-year limitation on suit is disclosed on page 76 of the SPD / Plan document.  (Ex. A.)  The Schedule of Benefits appears on pages 7-14.  (*Id.*) Likewise, the Medical Expense Provisions appear on pages 17-29.  (*Id.*)  The one-year limitation on suit appears a full 48 pages after these benefit provisions.  This is much larger than the 30-page gap between the benefits and limitations provisions that the court in *Spinedex* found sufficient to render unenforceable a similar time limitation on suit. *See also Salinas Valley Mem'l Healthcare Sys. v. Monterey Peninsula Horticulture, Inc.,* No. 17-CV-07076-VKD, 2018 WL 6268878, at *14 (N.D. Cal. Nov. 29, 2018) ("Here, as in *Spinedex*, the Plan's time bar provision is disclosed near the very end of the SPD (i.e., on page 66 of the 87-page document) and is not in close proximity to the

{00029803;1}

1  Schedule of Benefits on pages 12-13 of the SPD or the Medical Benefits section found on pages

2  22-23 of that document.").

3      139.   Plaintiff has brought this this action in a timely matter following the final denial of

4  its appeals of the Plan's adverse benefit denials.  This action would have complied with the

5  purported one-year limitation on suit (if it were enforceable).  However, the one-year time

6  limitation was not properly disclosed and is therefore not enforceable under ERISA.

7  <center>**FIRST CAUSE OF ACTION**</center>

8  <center>**(ERISA Section 502(a)(1)(B))**</center>

9  <center>(Against All Defendants)</center>

10      140.   Plaintiff incorporates all allegations set forth in the above paragraphs.

11      141.   Plaintiff has standing to pursue benefits under ERISA Section 502(a)(1)(B)

12  pursuant to its assignment of ERISA plan benefits from Patient A.

13      142.   When Patient A came to UC Davis Medical Center, she signed and executed

14  Plaintiff's standard "Terms and Conditions of Service" Form.  Patient A executed some version of

15  this form on at least four separate occasions, including, relevant to the services at issue here, on

16  August 3, 2021.

17      143.   That agreement included the following language:

18  9. ASSIGNMENT OF BENEFITS (INCLUDING MEDICARE BENEFITS): I authorize
19  and direct the payments to UCDHS of any insurance benefits including hospital insurance
and unemployment compensation disability benefits otherwise payable to or on my behalf
20  for UCDHS services, including emergency services, at a rate not to exceed those in the
Charge Master in effect on the date of service. I understand that I am financially
21  responsible for charges not paid pursuant to this agreement. I further agree that any credit
balance resulting from payment of insurance or other sources may be applied to any other
22  account owed to UCDHS by me.

23      144.   This language assigning Patient A's right to benefits is sufficient to confer upon

24  Plaintiff the right under ERISA to sue derivatively for benefits derivatively on Patient A's behalf.

25  *See Misic v. Building Service Employees Health and Welfare Trust*, 789 F.2d 1374 (9th Cir. 1986).

26      145.   The Plan explicitly permits assignments of benefits.  Page 32 states, "*if a **facility or**

27  **nonpreferred provider** indicates on a Form UB or on a Form HCFA (or similar claim form) that*

28  *the **facility** or **nonpreferred provider** has an assignment of benefits, then the **Plan** will require no*

1  *further evidence that benefits are legally assigned to that **facility** or **nonpreferred provider**.*"  (Ex.

2  A at 32 (underline emphasis added).)

3      146.    Accordingly, Plaintiff proceeds pursuant to its assignment of benefits from Patient

4  A and seeks benefits under the Plan.

5      147.    In so doing, Plaintiff was not required to waive any rights under ERISA, such as

6  the right to contest a payment determination or the right to balance bill Patient A.  Plaintiff also

7  never waived any of its rights under the Financial Agreement or the Terms and Conditions of

8  Service entered into by Patient A as a condition of receiving services from Plaintiff.  Plaintiff has

9  never taken any explicit action that could be construed as the waiver of any right.

10      148.    Every Form UB-04 billing form submitted by Plaintiff to the Plan indicated in the

11  appropriate box that Plaintiff had obtained an assignment of benefits from the patient.  Consistent

12  with the language of the Plan, Defendants accepted the Plaintiff's assignment of benefits.

13      149.    Plaintiff diligently pursued all internal appeals available under the Plan and

14  exhausted all appeal remedies.

15      150.    Defendants denied each of the appeals submitted by Plaintiff.  The most recent

16  final denial of Plaintiff's appeals occurred on January 6, 2023.  All appeals have been exhausted.

17      151.    Defendants underpaid benefits due under the Plan by failing to pay Plaintiff 100%

18  of the charges for Patient A's care above the Plan's $3,600 annual Out-of-Pocket Expense Limit,

19  as amended pursuant to the Plan provision titled "Conformity with Statute(s)."

20      152.    Plaintiff is entitled to benefits from the Plan for Patient A's care, specifically, the

21  portion of the $397,519.31 total unpaid charges for Patient A's care that is above the Plan's $3,600

22  annual Out-of-Pocket Expense Limit, along with appropriate interest.

23      153.    Put another way, Plaintiff is entitled to benefits from the Plan in an amount

24  between $393,919.31 and $397,519.31, plus interest, according to proof.

25      154.    Plaintiff is also entitled to its reasonable attorneys' fees under ERISA Section

26  502(g).

27  / / /

28  / / /

## **SECOND CAUSE OF ACTION**

### **(ACA Section 2707(b) via ERISA Section 502(a)(1)(B))**

(Against All Defendants)

155.    Plaintiff incorporates all allegations set forth in the above paragraphs.

156.    Plaintiff proceeds on this cause of action under ERISA pursuant to an assignment of benefits it has obtained from Patient A, as alleged above.

157.    In the alternative, and to the extent that the Plan's Out-of-Pocket Expense Limit Provision was not automatically amended pursuant to the Plan provision titled "Conformity with Statute(s)," Plaintiff seeks to enforce PHS Act Section 2707(b) directly through this second cause of action for ERISA benefits.

158.    Section 502(a)(1)(B) permits Plaintiff, via its assignment of benefits from Patient A, "to recover benefits due [] under the terms of [Patient A's] plan, to enforce [Patient A's] rights under the terms of the plan, [and/]or to clarify [Patient A's] rights to future benefits under the terms of the plan."

159.    Plaintiff brings this cause of action in the alternative to enforce Section 2707(b)'s requirements independently of the Plan's written terms and to thereby recover benefits due from the Plan.

160.    The Plan was obligated to comply with PHS Act Section 2707(b) with respect to the unpaid hospital bills at issue.  This requires the Plan to count towards the annual MOOP threshold all balance bills for Patient A's care.

161.    ERISA is an appropriate mechanism for the enforcement of the federal ACA requirements imposed on self-funded ERISA plans, including Section 2707(b).  *See King v. Blue Cross & Blue Shield of Illinois*, 871 F.3d 730 (9th Cir. 2017); 29 U.S.C. § 1185d.

162.    ACA does not prohibit Patient A (or Plaintiff, who stands in the shoes of Patient A) from enforcing the requirements of Section 2707(b).  The Plan is a self-funded ERISA plan exempt from state regulation.  Thus, the provisions of 42 U.S.C. § 300gg-22(a), titled "State enforcement," are inapplicable because the Plan at issue is not "health insurance coverage"

/ / /

1  governed by state law.  No California state health insurance regulator has any jurisdiction over the

2  Plan. [7]

3      163.    Two different federal judges have already permitted a hospital plaintiff proceeding

4  on a derivative assignment of benefits to enforce Section 2707(b) by means of a Section

5  502(a)(1)(B) cause of action.  *Salinas Valley Mem'l Healthcare Sys. v. Monterey Peninsula*

6  *Horticulture, Inc.*, No. 17-CV-07076-VKD, 2018 WL 6268878, at *14 (N.D. Cal. Nov. 29, 2018)

7  (DeMarchi, J.); *Salinas Valley Mem'l Healthcare Sys. v. Monterey Peninsula Horticulture, Inc.*,

8  No. 5:17-CV-07076-HRL, 2018 WL 2445349, at *16 (N.D. Cal. May 31, 2018) (Lloyd, J.).

9      164.    As alleged above, all appeals have been exhausted.

10     165.    Defendants underpaid benefits due under the Plan by failing to pay Plaintiff 100%

11  of the charges for Patient A's care above ACA's $8,550 maximum for individual out-of-pocket

12  liability for EHB expenses in calendar year 2021.

13     166.    Pursuant to the terms of PHS Act Section 2707(b), as incorporated by amendment

14  into the ERISA statute pursuant to Section 1185d, Plaintiff is entitled to benefits from the Plan, in

15  an amount calculated as follows: the $397,519.31 unpaid charges for Patient A's care that is above

16  ACA's $8,550 calendar year maximum for 2021, along with appropriate interest.

17     167.    Put another way, Plaintiff is entitled to benefits from the Plan in an amount

18  between $388,969.31 and $397,519.31, plus interest, according to proof.

19     168.    Plaintiff is also entitled to its reasonable attorneys' fees under ERISA Section

20  502(g).

21  / / /

22  / / /

23  / / /

24

25  _____

26  [7] Because it involved a health insurance policy, and not a self-funded ERISA plan, *Smith v. United Healthcare Insurance Company*, No. 18-CV-06336-HSG, 2019 WL 3238918 (N.D. Cal. July 18, 2019) is distinguishable and does not prohibit Plaintiff from enforcing the requirements of PHS Act Section 2707(b).  Smith also failed to consider the *King v. Blue Cross & Blue Shield of Illinois*, 871 F.3d 730, 741 (9th Cir. 2017), which acknowledged that an ERISA plaintiff may enforce PHS Act requirements that are incorporated into ERISA.

**WHEREFORE,** Plaintiff prays:

     A.     On the First Cause of Action, for an order obligating Defendants to pay ERISA benefits the amount of $397,519.31, or alternatively, an amount to be proved at trial;

     B.     On the Second Cause of Action, for an order obligating Defendants to pay ERISA benefits the amount of $397,519.31, or alternatively, an amount to be proved at trial;

     C.     For an award of costs, including attorneys' fees to the full extent permitted under the law, including without limitation, pursuant to ERISA, and any other applicable law;

     D.     For an award of pre- and post-judgment interest to the full extent permitted under law;

     E.     An award of such other relief as the Court deems just and proper.

Dated:  April 10, 2023          ATHENE LAW, LLP

          By:          */s/ Eric D. Chan*

          ERIC D. CHAN

**Attorneys for Plaintiff THE REGENTS OF THE UNIVERSITY OF CALIFORNIA on behalf of THE UNIVERSITY OF CALIFORNIA, DAVIS MEDICAL CENTER**