UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| The Regents of the University of California, a California Public Trust Corporation, on behalf of The University of California, Davis Medical Center,<br><br>Plaintiff,<br><br>v.<br><br>The Chefs' Warehouse, Inc., Employee Benefit Plan, et al.,<br><br>Defendants. | No. 2:23-cv-00676-KJM-CKD<br><br>ORDER |

The Regents of the University of California allege an employee benefit plan has wrongfully refused to cover the costs incurred by a plan participant who received treatment at the University of California (UC) Davis Medical Center. The patient assigned her rights to the hospital, which now assert claims against the benefits plan. The plan moves to dismiss for failure to state a claim. As explained below, the court **grants the motion with leave to amend**.

**I.    BACKGROUND**

About two years ago, a woman came to the UC Davis Medical Center and was admitted for five days' inpatient care. Compl. ¶ 12, ECF No. 1. She then received outpatient chemotherapy treatments at the same hospital for the next several months. *Id.* The hospital does

not say in its complaint whether this treatment was successful, but it does say how much it charged her: nearly half a million dollars. *Id.* ¶ 13.

When she first came to the hospital, the woman, who the Hospital refers to only as "Patient A," signed an agreement that made her personally liable for the cost of her treatment, and not just the half million dollars, but also any attorneys' fees, collections charges and any interest the hospital might later incur if she did not pay the bill as requested and on time. Compl. ¶ 66. She also agreed to "direct" any benefits payments she received from her health insurance, Medicare, or disability compensation to the hospital. *Id.* ¶ 143.

"Patient A" did not have employer-sponsored medical insurance. *See id.* ¶¶ 3–4, 9, 162. She participated instead in a self-funded, self-insured group health plan. *Id.* In this plan, the employer pays benefits and expenses directly from a fund generated in part by its own payments and in part by its employees' regular contributions. *See* Compl. Ex. A at 2, ECF No. 1-1. Despite differences between a self-funded plan and more traditional medical insurance policy, the plan is likely indistinguishable from traditional medical insurance from the perspective of the employees who participate in it: they contribute regularly from their paychecks on a pre-tax basis, the employer contributes as well, and the plan covers some or all the expenses they incur for medical care. *See id.*

The plan's specific terms are detailed in a lengthy packet of documents attached to the hospital's complaint. *See generally id.*[1] The plan—formally titled "The Chef's Warehouse, Inc. Employee Benefit Plan"—claims to cover chemotherapy at "100% after Deductible," which it sets at $2,700 for an individual. *Id.* at 7–8. The same is true for emergency services, diagnostic services and inpatient and outpatient hospital care, among other treatments: all are covered. *Id.* at 9–10. The plan also includes an individual "out-of-pocket expense limit" of $3,600, which it describes as "the most the covered person could pay in a year for covered expenses." *Id.* at 7.

---

[1] In quotations from the plan documents cited here, this order omits emphasis when it is used only to indicate which terms are defined. *Cf.* Mem. at 4 n.2, ECF No. 9-1 (doing the same).

2

One might expect, with these terms, that the plan would cover the costs of Patient A's care in full, but it did not. After the hospital sent its bill to the plan, the plan paid $75,000, leaving Patient A with a hospital bill of approximately $400,000. Compl. ¶¶ 13–14.

The reasoning behind the plan's denial is complex, and sorting through the plan's terms is not a simple exercise, but its reasoning can be laid out briefly as follows. The first task is decoding which expenses count toward the $3,600 limit and which do not, beginning on the page where the plan sets that limit. There it cautions three types of charges "do not apply to the out-of-pocket expense limit and are never paid at 100%." Ex. A at 7. The third item on this list is "expenses in excess of allowable claim limit." *Id.* The "allowable claim limit" is defined later. For any claims the plan receives from a "facility," such as the hospital in this case, the "allowable care limit" is calculated using a facility's costs as reported to the Centers for Medicare and Medicaid Services and costs allowed by Medicare. *See id.* at 30. The details of that calculation are not relevant for the pending motion; it is enough to say the end product could be only a small fraction of the total bill a facility sends the patient participant, and it could be derived from the provider's reported costs.

The plan relied on the third provision when it refused to pay the hospital's bill in this case. Only the expenses lower than the "allowable claim limit" were covered in full. *See* Compl. ¶¶ 57–63. The balance was "in excess" of the "allowable claim limit," so the $3,600 limit on out-of-pocket expenses did not apply, leaving "Patient A" responsible for the difference between the hospital's bill and the allowable claim limit. *See id.* ¶¶ 63–65. In total, despite the statements in the schedule of benefits that chemotherapy, diagnostic services, emergency services and inpatient and outpatient hospital care were covered "100% after Deductible," the plan paid only about 19 percent of the bill the hospital charged for its care of Patient A. *See id.* ¶ 63.

The hospital pursued an internal appeal of the plan's denial on behalf of Patient A, without success. *See id.* ¶ 125. It then filed this lawsuit. It alleges the plan is akin to the illegal "junk" insurance policies Congress outlawed when it passed the Patient Protection and Affordable Care Act, more commonly known as the ACA. *See id.* ¶¶ 120–22. The hospital claims the plan has engaged in "subterfuge" by promising to cover "100%" of chemotherapy,

hospital stays and other costly services, while in reality it covers only the lower amounts calculated with the allowable claim limits formula. *Id.* ¶¶ 123–24. The hospital emphasizes the plan has not negotiated acceptable reimbursement rates with any nearby hospitals, as other insurance and benefits plans do. *See, e.g.*, *id.* ¶¶ 33–37, 52. That is, although the plan has a "network" of individual doctors and other medical professionals, and although it covers hospital care, the plan has no "network" of hospitals and other "facilities." *See, e.g.*, *id.* ¶ 40.

The hospital makes two similar claims based on these allegations, both under the Employee Retirement Income Security Act (ERISA). First, the hospital alleges the plan's refusal to apply the $3,600 limit to the bill for Patient A's treatment contradicts the plan's terms, as modified by the ACA and ERISA. *See id.* ¶¶ 140–54. Second, the hospital alleges the ACA and ERISA impose an independent $8,550 limit on out-of-pocket expenses, and it claims the plan must cover any amounts above that limit. *See id.* ¶¶ 155–68.

The plan moves to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See generally* Mot., ECF No. 9; Mem., ECF No. 9-1. The hospital opposes the motion. *See generally* Opp'n ECF No. 16. Its opposition exceeds the page limits set in this court's standing order. *See* Standing Order at 3, ECF No. 3-1. The court has disregarded the excessive final page. The plan has replied. ECF No. 19. "Patient A" is not a party to this case, and neither party believes her participation is necessary under the Federal Rules. The court heard oral arguments on September 1, 2023. Eric Chan appeared for the hospital, and Kristopher Alderman and Donald Miller appeared for the plan.

## II.     FAILURE TO STATE A CLAIM

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In response, the court begins by assuming the complaint's factual allegations are true, but not its legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court then determines whether those factual allegations, assumed true, "plausibly give rise to an entitlement to relief" under Rule 8. *Id.* at 679. This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense." *Id.*

The plan raises several challenges. Some of its arguments attack the hospital's claims as a threshold matter. The plan presents these arguments first in its motion. It argues, for example, that the hospital cannot enforce Patient A's rights under her agreement to assign benefits to the hospital, *see, e.g.*, Mem. at 7–10, and it argues the hospital cannot pursue claims under the ACA via ERISA, *see, e.g.*, *id.* at 10–13. It is not necessary to make any final decisions about these threshold arguments now, as the plan's attack on the merits of the hospital's claims themselves is persuasive alone. As the parties confirmed at hearing, no claim about ACA and ERISA violations could succeed unless the hospital ultimately proves there was such a violation, regardless of the other potential faults the plan now raises.

Before wading into the parties' arguments about how to interpret the relevant statutes, the court first reviews the interpretive rules it must employ. The words of a statute are always the place to begin. *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012). Unless Congress specifies otherwise, words in statutes have the same meanings as in common use. *Roberts v. Sea–Land Servs., Inc.*, 566 U.S. 93, 100 (2012). Context also matters, both "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). But the court may not rewrite a statute "so that what was omitted, presumably by inadvertence, may be included within its scope." *Lamie v. United States Tr.*, 540 U.S. 526, 538 (2004) (quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926)). "There is a basic difference between filling a gap left by Congress'[s] silence and rewriting rules that Congress has affirmatively and specifically enacted." *Id.* (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)). That is true even if the statute's clear terms arguably undercut Congress's ostensible purposes. *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 135 (2015).

Moving now to the ACA, under a provision found in 42 U.S.C. § 300gg-6(b), health plans must "ensure that any annual cost-sharing imposed under the plan does not exceed the limitation provided for under [42 U.S.C. § 18022(c)]." That limit changes from year to year. In 2021, the year Patient A sought care from the hospital in this case, the limit was $8,550. Compl. ¶ 70. In short, the plan cannot force participants to share costs greater than $8,550.

What, then, does it mean to "share costs"? The ACA defines the term "cost-sharing." It begins with a "general" definition: cost-sharing includes "deductibles, coinsurance, copayments, or similar charges," and other expenditures. 42 U.S.C. § 18022(c)(3)(A). The definition then makes an exception: cost-sharing "does not include premiums, balance billing amounts for non-network providers, or spending for non-covered services." *Id.* § 18022(c)(3)(B). As a result, deductibles, coinsurance, and similar charges all count toward the $8,550 limit, but premiums, balance bills for "non-network providers," and spending for "non-covered services" do not. This means the ACA would not bar a plan from requiring its participants to pay their premiums, any balance bills from outside the plan's network, and the costs of any services the plan does not cover, regardless of the $8,550 limit.

In this case, the plan required Patient A to cover roughly $400,000 of the bill for her treatment at UC Davis. Under the "general" definition above, that $400,000 sum likely qualified as a "cost-sharing" expense. But the hospital was not within any "network" of providers the plan used. The plan's network included no hospitals at all. As the hospital alleges, the plan elected to make arrangements with only individual professionals. *See, e.g.*, *id.* ¶¶ 40–46. This meant the $400,000 remainder—the "balance" of the hospital's bill—was for care by a non-network provider. Under the exception above, the $400,000 did not count toward the $8,550 limit. It was a balance billing amount for a non-network provider.

The Hospital's complaint does not identify ACA provisions showing Congress used the words "non-network providers" and "balance billing" in any unusual or unexpected ways. And labyrinthine though the ACA's provisions and the plan documents may be, the end result seems clear: a plan can saddle a patient with the balance of a provider's bill if the provider is not in the plan's network. Another district court within this circuit considered the same provisions in a very similar case and reached the same conclusion. *See Salinas Valley Mem'l Healthcare Sys. v. Envirotech Molded Prod., Inc.*, No. 17-03887, 2017 WL 5172389, at *3–5 (N.D. Cal. Nov. 8, 2017). This court cannot change the ACA's language, faulty though it may be from the perspective of a plan participant or a hospital, or even a judge. *See Lamie*, 540 U.S. at 538; *Envirotech*, 2017 WL 5172389, at *4.

The hospital argues it falls outside the ACA's exclusion for balance bills from "non-network providers." *See, e.g.*, Opp'n at 17. It does not contend, however, that it actually was in the plan's network. It alleges there was no network at all. In its reading of the ACA, if a plan has no network of hospitals to begin with, then there can be neither network hospitals nor non-network hospitals; there are just hospitals. *See, e.g.*, Compl. ¶ 84. But the plan has a network; the hospital is simply outside that network. True, the network includes no hospitals, but the hospital cites no ACA provisions requiring plans to include hospitals in their networks, and the court has located none.

The hospital next cites a collection of regulations, regulatory guidance and analogous statutory provisions in an effort to prove the ACA's cost-sharing rules implicitly require plans to establish a network of hospitals. First, the hospital cites a proposed rule justifying differences in requirements for "in-network" and "out-of-network" plans by pointing out that only people who "choose to purchase services outside of the plan's network" would pay additional costs. *See* Opp'n at 17–18 (emphasis and alterations omitted) (quoting U.S. Dep't of Health & Human Servs., "Patient Protection & Affordable Care Act; Standards Related to Essential Health Benefits, Actuarial Value, and Accreditation," 77 Fed. Reg. 70,644, 70,654 (Nov. 26, 2012)). The hospital similarly emphasizes the importance of choice by citing the Department of Health and Human Services' finding that most people choose to spend their money within the plan network. *See id.* at 19 (citing U.S. Dep't of Health & Human Servs., "Patient Protection and Affordable Care Act; Standards Related to Essential Health Benefits, Actuarial Value, and Accreditation," 78 Fed. Reg. 12,834, 12,848 (Feb. 25, 2013)). Without a choice between network and non-network providers, the hospital contends, the ACA's exception for balance billing amounts would swallow the rule against excessive cost-sharing. *See* Opp'n at 18. Choice is the "linchpin," in its view. *See id.*

This argument depends on an unsupported premise. No allegations in the complaint permit the court to assume Patient A's only choice—or any plan participant's only choice—was to seek treatment from a hospital rather than an individual professional provider within the network. Nor has the hospital shown plans must include hospitals in their networks. The

7

1  regulation it cites in support of that argument does not impose such a requirement; it creates a
2  "[s]pecial rule for network plans."  45 C.F.R. § 156.130(c).  That "special rule" reiterates the
3  statutory definition of "cost-sharing," summarized above: plans may require participants to share
4  in the costs of care provided outside the plan's network.  *Id.*

5        The hospital also advocates an analogy to provisions in a different section of the ACA.
6  *See* Opp'n at 18–19.  Those provisions require plans to cover specific types of preventive care
7  and prohibit plans from imposing "any cost sharing requirements" for that care.  42 U.S.C.
8  § 300gg-13(a).  Related regulations excuse plans from maintaining a network of providers for
9  these preventive services, *see* 45 C.F.R. § 147.130(a)(3)(i), but if a plan does not maintain a
10 network, it must "cover the item or service when performed by an out-of-network provider, and
11 may not impose cost-sharing with respect to the item or service," *id.* § 147.130(a)(3)(ii).  In the
12 hospital's view, these regulations prevent plans from offering "token or inadequate networks."
13 Opp'n at 19.  By analogy, the hospital contends, if plans could sidestep the cost-sharing rules by
14 closing their networks to hospitals, then those rules would be meaningless.  *See id.*  But the
15 hospital cites no counterparts to 45 C.F.R. § 147.130(a)(3) in regulations of out-of-pocket limits.
16 And as summarized above, some regulations interpreting the out-of-pocket limits expressly
17 permit plans to shift balance billing amounts to plan participants, and they make no demand for
18 networks of a specific type or qualification.  *See* 45 C.F.R. § 156.130(c).

19       Finally, the hospital relies on guidance from a group of federal agencies tasked with
20 administering the ACA.  *See* Opp'n at 19–21.  The court may consider this guidance without
21 converting the plan's motion into a motion for summary judgment, as the hospital cites the
22 guidance in its complaint.  *See, e.g.*, Compl. ¶ 85; *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.
23 2005) (relying on "incorporation by reference" doctrine, "which permits [a court] to take into
24 account documents whose contents are alleged in a complaint and whose authenticity no party
25 questions" (citations, alternations, and quotation marks omitted)).  The court also may take
26 judicial notice that the agencies offered this guidance, as it is publicly available and its contents
27 are not disputed.  *See* Fed. R. Evid. 201(b).

The cited guidance focuses on plans that use "reference prices," i.e., when a plan "pays a fixed amount for a particular procedure (for example, a knee replacement), which certain providers will accept as payment in full." U.S. Dep'ts Labor, Health & Human Servs. & Treasury, "FAQs About the Affordable Care Act Implementation (Part XIX) (May 2, 2014), Req. J. Not. Ex. 3 at 5, ECF No. 17-1. The three agencies feared reference prices might be employed as "subterfuge for the imposition of otherwise prohibited limitations on coverage, without ensuring access to quality care and an adequate network of providers." *Id.* After requesting and receiving comments, the agencies decided they would "consider all the facts and circumstances when evaluating whether a plan's reference-based pricing design (or similar network design) . . . is using a reasonable method to ensure adequate access to quality providers at the reference price." U.S. Dep'ts Labor, Health & Human Servs. & Treasury, "FAQs About the Affordable Care Act Implementation (Part XXI) (Oct. 10, 2014), Req. J. Not. Ex. 4 at 2–4, ECF No. 17-1. If plans used fixed reference prices without ensuring "participants have adequate access to quality providers that will accept the reference price as payment in full," the agencies would require the plan "to count an individual's out-of-pocket expenses" toward the statutory limit. U.S. Dep'ts Labor, Health & Human Servs. & Treasury, "FAQs About the Affordable Care Act Implementation Part 31, Mental Health Parity Implementation, and Women's Health and Cancer Rights Act Implementation" (April 20, 2016), Req. J. Not. Ex. 5 at 9, ECF No. 17-1.

The hospital does not ask the court to defer to this guidance under *Chevron, U.S.A. Inc. v. National Resources Defense Council*, 467 U.S. 837 (1984). It argues the agencies' guidance is persuasive under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). "The fair measure of deference to an agency administering its own statute" under the so-called *Skidmore* rule "has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (citations omitted). "The approach has produced a spectrum of judicial responses, from great respect at one end to near indifference at the other." *Id.* (citations omitted).

9

Without more detail about the relevant market for healthcare, what care is available, and at what costs, the guidance the court has reviewed above has relatively little persuasive power for this case. The three agencies were answering questions about reference pricing, not pricing schemes that took both costs and Medicare pricing into account, as the plan's multiplier scheme does in this case. Nor did the agencies discuss a situation like this one, in which a plan's network excludes providers in a broad class, such as all hospitals and other "facilities."

This is not to say the agencies' guidance is irrelevant. As another district court found in a similar case, the guidance might fill out the relevant context and could show the ACA's definition of "cost sharing" is actually ambiguous in a relevant way. *See Salinas Valley Mem'l Healthcare Sys. v. Monterey Peninsula Horticulture, Inc.*, No. 17-07076, 2018 WL 2445349, at *12–14 (N.D. Cal. May 31, 2018). In *Monterey Peninsula Horticulture*, the disputed health plan limited payments to "reasonable and customary" amounts, later defining that phrase in part by referring to Medicare prices and in part by referring to "the reasonable and customary charge for the same treatment, service, or supply furnished in the same geographic area by a provider of like service." *See id.* at *4–5. The plaintiff's complaint in the case cited the agency guidance this court has reviewed above. *See id.* at *13–14. For example, it quoted the agencies' opinions about what would happen if a plan used reference prices without ensuring "participants have adequate access to quality providers that will accept the reference price as payment in full." *Id.* Combined with the plaintiff's allegations about the disputed references to a "reasonable and customary charge" and Medicare prices, the guidance supported the plaintiff's claim that "if a plan is going to have a reference price . . . for hospital services, then it has to have a network of hospitals, or at least one that includes hospitals." *Id.* at *14. The defendants had no response; they contended only that the argument was "confusing." *Id.* The district court thus denied their motion to dismiss. *See id.* at *16.

In this case, by contrast, the plan points to specific gaps in the hospital's theory. *See, e.g.*, Reply at 9–10. For example, the plan documents refer not only to Medicare pricing; they also refer to the provider's costs. *See id.* at 10. As noted above, it is unclear how the agencies would have responded to limits based on costs, and the hospital's complaint lacks allegations necessary

1   to show the agencies' guidance is persuasive in a way that matters for this case under *Skidmore*.
2   The hospital does not allege, for example, that Patient A had no choice but to seek care at a
3   hospital, that care was practically unavailable, that no providers accept prices like those the plan
4   sets, or that providers who accept the plan's price limits offer care that meets "reasonable quality
5   standards." *See* Req. J. Not. Ex. 4 at 3–4, ECF No. 17-1.  Without allegations along these lines,
6   the court cannot rely on the agencies' guidance to conclude there was not actually a "network," as
7   the hospital contends.

8   In sum, because the hospital's claims as pled rely on theories that are not plausible under
9   the ACA's terms, the plan's motion to dismiss is granted.

10  **III.   LEAVE TO AMEND**

11  District courts ordinarily permit plaintiffs to amend their complaints when their defects
12  can be "cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.
13  2000) (en banc).  But district courts may dispense with amendments that would amount to an
14  exercise in futility.  *See, e.g.*, *Leadsinger, Inc. v. BMG Music Publ'g,* 512 F.3d 522, 532 (9th Cir.
15  2008).  In general, an amendment is futile only if that is "clear beyond doubt."  *Ctr. for Biological*
16  *Diversity v. Veneman*, 394 F.3d 1108, 1114 (9th Cir. 2005) (citing *Thinket Ink Info. Res., Inc. v.*
17  *Sun Microsys., Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004)).

18  It is not clear beyond doubt that the defects above would persist in any amended
19  complaint.  In *Envirotech*, for example—the similar case cited above—the court granted leave to
20  amend, and the plaintiffs added new allegations against the plan and new claims against an
21  additional defendant.  *See* 2018 WL 2298676, at *2.  The added defendant moved to dismiss, but
22  the plan did not.  *See id.*  The district court therefore did not consider whether the plaintiff's
23  additional allegations stated a claim against the plan, and the claims against the plan went to
24  discovery.  Before the case progressed further, however, the parties reached a settlement
25  agreement, and the action was dismissed.  *See* Notice of Settlement, No. 17-cv-3887 (N.D. Cal.
26  May 22, 2018), ECF No. 58; Stipulation, No. 17-cv-3887 (N.D. Cal. July 13, 2018), ECF No. 63.
27  In this case, the hospital could likely add allegations to its complaint to show why the agencies'

guidance reveals an ambiguity in the ACA's definition of "cost sharing" or why the agency's guidance relies on a persuasive interpretation of the ACA.

As explained at the beginning of the previous section, however, the plan's motion does make two threshold arguments that could show amendment would be futile. The court considers these arguments in turn.

### A.   ERISA Enforcement Rights

The first of the plan's arguments attacks the hospital's right to bring its claims under ERISA. Both the hospital's claims invoke ERISA's civil enforcement provisions. *See* Compl. ¶¶ 141, 158. Those provisions permit civil actions "by a plan participant or beneficiary . . . to recover benefits due to him under the terms of his plan." 29 U.S.C. §1132(a)(1)(B). The plan points out the hospital is neither a "participant" nor a "beneficiary." The hospital does not claim to be a "plan participant." It did not make contributions to the plan. Nor are healthcare providers "beneficiaries" in the relevant sense. *DB Healthcare, LLC v. Blue Cross Blue Shield of Arizona, Inc.*, 852 F.3d 868, 874–76 (9th Cir. 2017). The hospital does not argue otherwise. It alleges instead that Patient A, who no one disputes is a "participant" under ERISA, authorized the hospital to pursue her ERISA claim on her behalf. *See* Compl. ¶ 143.

ERISA plan participants can, in general, assign their ERISA claims to the hospitals and others who care for them. *See DB Healthcare*, 852 F.3d at 876. Whether a particular claim was assigned depends on the parties' intentions, ordinarily as expressed in a written agreement. *See id.* The plan argues Patient A did not actually assign the hospital any right to pursue the claims it now asserts. The hospital argues she did.

At this stage, it is not clear beyond doubt that the hospital has no authority to pursue its ERISA claims. According to the complaint, Patient A agreed to "authorize and direct the payments to [the hospital] of any insurance benefits . . . otherwise payable to or on [her] behalf." Compl. ¶ 143. The right to payment includes the right to sue for non-payment. *See DB Healthcare*, 852 F.3d at 877 & n.7.

The plan does not argue otherwise. It contends instead, first, that the plan is not "insurance," which would mean plan benefits are not among the "insurance benefits" Patient A

authorized the hospital to seek on her behalf. *See* Mem. at 8. After all, the plan points out, the hospital alleges in its complaint that "the Plan at issue is not 'health insurance coverage.'" *Id.* (quoting Compl. ¶ 28). But certain language in the disputed authorization shows the word "insurance" has a broader meaning than the plan admits. The authorization offers two examples of "insurance" parenthetically. One suggests a narrower conception of "insurance," which aligns with the plan's argument: "hospital insurance." Compl. ¶ 143. The other, however, is broader: "unemployment compensation disability benefits." *Id.* "Unemployment compensation disability benefits" might refer to a variety of payments from a variety of sources, including benefits paid by a self-funded plan or even a government social program, such as Medicare, which the Assignment itself mentions. *See id.* Because the authorization uses the word "insurance" broadly in this way, it would be plausible to conclude that "insurance benefits" also refers to the benefits paid by a self-funded plan like the one in this case.

The agreement's broader context supports this conclusion as well. As another federal district court has pointed out, most people probably would think a self-funded benefits plan arranged by an employer is, in fact, "health insurance." *See Martin Luther King, Jr. Cmty. Hosp. v. Cmty. Ins. Co.*, No. 16-03722, 2017 WL 8186738, at *2 (C.D. Cal. Mar. 21, 2017). At this early stage of the case, the court must draw reasonable inferences in the hospital's favor. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). One reasonable inference is that Patient A meant to authorize the hospital to pursue a claim against her employer's self-funded plan. Plan benefits might plausibly count as "insurance benefits."

Beyond "insurance," the plan also focuses on the word "benefits," which appears in the assignment as well. Again, Patient A agreed to "authorize and direct the payments to [the hospital] of any insurance *benefits* . . . otherwise payable to or on [her] behalf." Compl. ¶ 143 (emphasis added). The plan argues the hospital is not actually pursuing "benefits," but rather some other remedy, such as a reformation of the plan documents or for some unspecified form of equitable relief. *See* Mem. at 8–9. To the contrary, the hospital's complaint requests unpaid benefits expressly. *See, e.g.*, Compl. ¶ 153 (asserting in claim one that the hospital "is entitled to benefits from the Plan in an amount between $393,919.31 and $397,519.31, plus interest,

according to proof."); *id.* ¶ 167 (asserting similar entitlement in claim two); *id.* at 26 (requesting an order directing the payment of "ERISA benefits," costs, fees, and interest).  The hospital alleges it is entitled to benefits both under the terms of the plan and under the requirements of federal law.  *See* Opp'n at 8.  This is not, in other words, a case of a claim for declaratory or injunctive relief or for a breach of fiduciary duties, which may very well go beyond the hospital's authority to pursue.  *Cf., e.g.*, *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1292 (9th Cir. 2014); *Air Evac EMS Inc. v. USAble Mut. Ins. Co.*, No. 16-0266, 2018 WL 2422314, at *3–5 (E.D. Ark. May 29, 2018).  Nor is the hospital asking the court to reform the plan document; it advances an interpretation of that document.  For these reasons, the court rejects the plan's contention that the hospital lacks authority to pursue its claims on behalf of Patient A.  Amendment would not be futile for that reason.

### B.  Private Rights of Action Under the ACA

Finally, the plan argues that even if the hospital does have authorization to pursue its claims, it could not do so, because private parties cannot enforce the ACA via ERISA as the hospital now endeavors to do.  *See* Mem. at 10–13.  The parties cite no binding decisions by either the Supreme Court or Ninth Circuit, and the court has located none.  Some federal district courts have held that private litigants cannot pursue claims like those the hospital now asserts.  *See, e.g.*, *Reg'l Med. Ctr. of San Jose v. WH Adm'rs, Inc.*, No. 17-03357, 2021 WL 4481667, at *7 (N.D. Cal. Sep. 30, 2021) (collecting authority).  Others have evaluated similar claims without deciding whether private litigants could assert them or without voicing any concerns about private enforcement.  *See, e.g.*, *Salinas Valley Mem'l Healthcare Sys. v. Monterey Peninsula Horticulture, Inc.*, No. 17-07076, 2018 WL 6268878, at *15 (N.D. Cal. Nov. 29, 2018); 2017 WL 5172389, at *3–5 (N.D. Cal. Nov. 8, 2017).  As the hospital points out, the Seventh Circuit and Department of Labor have hypothesized that private parties could bring claims like those in the hospital's complaint.  *See* Opp'n at 15 (citing *Korte v. Sebelius*, 735 F.3d 654, 660 (7th Cir. 2013) and U.S. Dep't Labor, "Discrimination on the Basis of Sex," 81 Fed. Reg. 39,108, 39,131 & n.139 (June 15, 2016)).

To complicate matters further, the hospital relies on a so-called "conformity clause" within the plan. *See, e.g.*, Compl. ¶ 151.  Under that clause, if a plan provision "is in conflict" with an applicable statute—such as the ACA, the hospital contends—the plan is "hereby amended to conform to the minimum requirements of said statute(s)." Ex. A at 75.  As discussed above, the hospital claims the plan's provisions on out-of-pocket maximums conflict with the ACA and ERISA, so it contends the plan's provisions are amended to conform with the ACA and ERISA automatically.  *See, e.g.*, Opp'n at 8, 16–20.  Again, it appears neither the Ninth Circuit nor the Supreme Court has issued any controlling opinions, and federal district courts have disagreed with one another in similar cases.  *Compare, e.g.*, *Bushell v. UnitedHealth Grp. Inc.*, No. 17-2021, 2018 WL 1578167, at *3–4 (S.D.N.Y. Mar. 27, 2018) (rejecting arguments based on conformity clause) *with, e.g.*, *Emch v. Cmty. Ins. Co.*, 17-856, 2019 WL 5538196, at *2–3 (S.D. Ohio Oct. 25, 2019) (disagreeing with *Bushell*).  The Ninth Circuit also has held an ERISA plan participant could pursue claims based on an applicable state law even though her plan, "considered alone," did not offer the coverage she sought.  *See Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 703 (9th Cir. 2012).  That holding implies the hospital's theory could be viable.

Considering these conflicting authorities, the court cannot exclude the possibility the hospital could amend its complaint to state a plausible claim under the ACA via ERISA, the plan's conformity clause, both, or some combination.  The hospital is granted leave to amend if possible within the confines of Federal Rule of Civil Procedure 11.

## IV.   CONCLUSION

The motion to dismiss (ECF No. 9) is **granted with leave to amend**.  Any amended complaint must be filed **within twenty-one days**.

IT IS SO ORDERED.

DATED: October 31, 2023.

CHIEF UNITED STATES DISTRICT JUDGE