ERIC D. CHAN (State Bar No. 253082)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Culver City, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
Attorneys for Plaintiff THE REGENTS OF
THE UNIVERSITY OF CALIFORNIA on
behalf of THE UNIVERSITY OF
CALIFORNIA, DAVIS MEDICAL CENTER

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California Public Trust Corporation, on behalf of THE UNIVERSITY OF CALIFORNIA, DAVIS MEDICAL CENTER,<br><br>           Plaintiff,<br><br>   vs.<br><br>THE CHEFS' WAREHOUSE, INC. EMPLOYEE BENEFIT PLAN, THE CHEFS' WAREHOUSE, INC., a Delaware corporation, and DOES 1-20, inclusive;<br><br>       Defendants. | Case No.: 2:23-cv-00676-KJM-CKD<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) BENEFITS UNDER SECTION 502(a)(1)(B) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)**<br><br>**(2) AFFORDABLE CARE ACT SECTION 2707(b) (OUT OF POCKET MAXIMUM), VIA ERISA SECTION 502(a)(1)(B)**<br><br>Judge:  Hon. Kimberly J. Mueller<br><br>Complaint Filed:  April 10, 2023 |

Plaintiff, the Regents of the University of California on behalf of the University of California, Davis Medical Center ("Plaintiff," or "the Hospital") complains and alleges:

## THE PARTIES

1.      UC Davis Health is a nationally recognized academic health system, offers specialty care in 150 fields, and is nationally ranked in nine specialties, including cancer care, cardiology & heart surgery, diabetes & endocrinologist, ear, nose & throat, geriatrics, neurology and neurosurgery, obstetrics & gynecology, orthopedics, and pulmonology & lung surgery.[1] Plaintiff prides itself on putting the needs of the patient first.

2.      UC Davis Health includes the Hospital and UC Davis Medical Group, which consists of individual physicians and practitioners, many of whom render professional services exclusively at the Hospital (including its hospital-based outpatient departments/clinics, like the UC Davis Cancer Center).

3.      On information and belief, Defendant The Chefs' Warehouse, Inc. is a Delaware corporation that does business in the Sacramento, CA area.

4.      On information and belief, Defendant The Chefs' Warehouse, Inc. Employee Benefit Plan (the "Plan") is a self-funded health benefits plan governed by the Employment Retirement Income Security Act of 1974 (ERISA).  The Plan is a proper defendant pursuant to ERISA section 502(d).  29 U.S.C. § 1132(d).  Plaintiff is informed and believes that Defendant The Chefs' Warehouse, Inc. is the sponsor of the Plan, and is also the Plan Administrator as that term is understood under ERISA.

5.      The true names and capacities of the defendants sued herein as DOES are unknown to Hospital at this time, and Hospital therefore sues such defendants by such fictitious names. Hospital is informed and believe that the DOES are those individuals, corporations and/or businesses or other entities that are also in some fashion legally responsible for the actions, events and circumstances complained of herein, were the agents, representatives, or employees of the other defendants, and may be financially responsible to Hospital for the services it has provided to

---

[1] UC Davis Health, Ranked Among the Nation's Best, https://health.ucdavis.edu/discoverying-healthy/recognitions/ (last visited April 3, 2022).

FIRST AMENDED COMPLAINT

1   the Patient.  The Complaint will be amended to allege the DOES' true names and capacities when

2   they have been ascertained.

3       6.      Together, The Chefs' Warehouse, Inc., The Chefs' Warehouse, Inc. Employee

4   Benefit Plan, and DOES 1-20 are referred to herein as "Defendants."

5                          **JURISDICTION AND VENUE**

6       7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

7   § 1331, because the action arises under the laws of the United States; pursuant to 29 U.S.C.

8   § 1132(e)(1), because the action seeks to enforce rights under ERISA.

9       8.      The Sacramento Division of the United States District Court for the Eastern District

10  of California is the appropriate venue for the filing of this case pursuant to Eastern District Local

11  Rule 120(d), because a substantial part of the events or omissions that give rise to UC Davis

12  Health's claims occurred in Sacramento County.

13                          **FACTUAL ALLEGATIONS**

14    **A.  Overview**

15      9.      The Hospital brings this lawsuit against the named Defendants for failure to shield

16  Patient A, a beneficiary of The Chefs' Warehouse, Inc. Employee Benefit Plan, from liability in

17  excess of the cost-sharing limits mandated by the Patient Protection and Affordable Care Act

18  ("PPACA," the "Affordable Care Act," or "ACA").   Plaintiff brings this action pursuant to a

19  validly executed assignment of benefits from Patient A.

20      10.     In calendar year 2021, the federal government mandated that federal maximum

21  annual limitation of $8,550 for an individual.[2]  This threshold is referred to throughout this

22  Complaint as ACA's maximum annual out-of-pocket limitation, or "MOOP" limit for short.

23      11.     Patient A presented to the Hospital for inpatient cancer surgery on or around

24  August 3, 2021, recovered, and was discharged on August 7.

25  / / /

26

27  [2] See Final Rule, Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment
    Parameters for 2021; Notice Requirement for Non-Federal Governmental Plans, 85 Fed Reg.
28  29164, 29229 (May 14, 2020).

                          FIRST AMENDED COMPLAINT

12.     Thereafter, Patient A received chemotherapy, radiation, and related services over the course of several months.

13.     The Plan paid only $74,512.84 of the $397,519.31 in total charges submitted by Plaintiff. This represents just 18.7% of the total charges for Patient A's care.

14.     Defendants' payment decision rendered Patient A liable for the unpaid balance for the care rendered by Plaintiff in a total amount of $323,006.47.

15.     The Plan covers the full range of hospital benefits including emergency care, inpatient hospitalization, and outpatient cancer care, which are known as Essential Health Benefits (EHBs).  At the same time, the Plan provides no hospital delivery system through which Plan beneficiaries could receive these benefits.

16.     Specifically, Defendants deliberately designed the Plan <u>without any network of hospitals capable of furnishing the emergency, inpatient, and outpatient cancer care that Patient A received</u>.  Under the Plan, there are no "in-network" hospitals and "out-of-network" hospitals. The Plan was designed from the ground up so it does not utilize any network of hospitals.  This is even though many health conditions can be treated only in a hospital facility (e.g., cancer surgery).

17.     For the care she required, Patient A <u>had no choice</u> but to receive hospital services, and it would have been impossible for Patient A to obtain the necessary care in a physician office/non-hospital setting.

18.     Patient A required delicate hospital-based surgery and inpatient hospitalization, followed by aggressive treatment sessions involving same-day radiation and chemotherapy – with one typically in the morning followed by the other in the afternoon.

19.     The Plan's physician/practitioner-only network was incapable of offering such care to Patient A.

20.     To make matters worse, the Plan coupled its flawed, physician-only network design with fixed indemnity-type benefits for hospital care.  The extremely low level of payment paid by the Plan – which is far less than Plaintiff receives from the major commercial health insurers with which UC Davis Health contracts and is "in-network" for hospital and professional services – was

/ / /

1  nothing more than a subterfuge to avoid ACA protections that ensure that patients are not exposed

2  to potentially ruinous liability for covered, essential health care costs.

3        21.     By paying a fixed indemnity-type amount and entirely foregoing any network of

4  hospitals, Defendants routinely expose their own employees and their families to potentially

5  catastrophic liability, in direct violation of longstanding ACA patient protections.  Essentially,

6  Defendants engage in an extreme version of an already-controversial approach known as

7  "reference pricing"  (or "reference-based pricing.")  In so doing, Defendants subvert the entire

8  managed care system, which is premised on the affordable delivery of care – virtually always via

9  networks of hospitals and professionals.

10        22.     The explicit goal of setting up a flawed and noncompliant health plan, as

11  Defendants did, was to avoid paying a negotiated amount for hospital services.  Congress

12  outlawed fixed indemnity policies, also known as "junk insurance," when it passed the ACA over

13  twelve years ago.  By adopting the above-described plan design, Defendant The Chefs'

14  Warehouse sought nothing less than to make an end-run around ACA's prohibition on such "junk

15  insurance."

16        23.     Defendants had a clear legal obligation to ensure that Plan beneficiaries had

17  adequate access to the hospital services that were a covered benefit under the Plan.  Virtually the

18  entire health insurance industry meets this obligation by contracting with a network (or networks)

19  that include both hospital and professional service providers.  In contrast, Defendants chose not to

20  negotiate rates and contract with hospitals at all, and instead chose to impose a reference pricing

21  structure to every kind of hospital item or service available under the Plan.

22        24.     Three federal agencies have been charged with implementing the ACA and

23  policing its protections for patients: the United States Department of Health and Human Services

24  (HHS), the United States Department of Labor (DOL), and the United States Department of

25  Treasury (together, the "Agencies").  The Agencies have long-recognized that there is significant

26  potential for abuse by health plans that use a reference pricing model, and established extremely

27  strict guardrails that curtail its use.

28  / / /

25.     Under the Agencies' very explicit written guidance, a plan may not utilize reference pricing <u>unless</u> it employs a "reasonable method" of doing so – by complying with the safeguards set forth in the guidance.  These safeguards include ensuring that an adequate number of providers will accept the reference price as payment in full; maintaining quality standards that providers accepting the reference price are required to meet; and offering an exceptions process to "save" the patient from unnecessary liability.  If a health plan fails to utilize a "reasonable method" for reference pricing, then ACA obligates the plan to pay the entire balance for the care that exceeds the annual MOOP, and cannot limit its obligation/responsibility to the reference price.

26.     This outcome aligns with ACA's overarching policy goal: to protect patients from excessive out-of-pocket costs, especially for emergency stays and other medically necessary hospital care, including cancer care.

27.     Defendants now seek to avoid liability by claiming they do not engage in a reference-based pricing scheme at all, but rather, some next-generation model for efficient health care delivery.  Defendants do nothing of the sort.  Their plan simply utilizes two inadequate reference prices, paying at the higher of the two.  Defendants even hired the self-described leading "reference pricing" consultant in the country for the express purpose of implementing the Plan's deeply flawed reference pricing scheme.

28.     No hospital in the Sacramento region would accept either reference price under the Plan, especially from a plan that lacks a substantial beneficiary/participant population in the region.

29.     The Agencies' definitive guidance on reference pricing, which Defendants' ignored, establishes that Patient A should never have been responsible for more than $8,550 in unpaid medical bills for calendar year 2021.  Defendants therefore owe to Plaintiff the portion of the balance of $323,006.47 to Plaintiff that is over the $8,550 calendar year limit for 2021, along with appropriate interest.

/ / /

/ / /

**B. The Plan Covered Emergency Care, Inpatient Hospitalization, and Cancer Care, which are Essential Benefits under ACA**

30.     The Plan is set up using a self-funded structure, meaning that it is liable, dollar-for-dollar, for the direct healthcare costs of employees and their families who are covered under the Plan.  The Plan is not "insurance" within the meaning of the ERISA.  It is self-insured.

31.     The Plan covers the full range of health care benefits for beneficiaries and participants of the Plan, including surgery, hospital inpatient stays, chemotherapy and radiation treatment – all of which were received by Patient A.

32.     The October 1, 2020 Plan and Summary Plan Description for the Plan is attached hereto as **<u>Exhibit A</u>**.  The Plan's Schedule of Benefits begins on page 7, and all of the hospital services the Patient received – including inpatient hospital services, diagnostic radiology, laboratory, chemotherapy and radiation treatment – are covered by the Plan in full after the deductible is met.

33.     And all of the above-mentioned categories are Essential Health Benefits (EHBs) within the meaning of the Affordable Care Act.  *See* 42 U.S.C. § 18022(b) (PPACA Section 1302(b)).

34.     While self-funded group health plans are not obligated to cover all categories of EHBs, plans that do choose to cover EHBs (like the Plan here) are subject to ACA requirements, including the requirement that a patient not be subjected to liability in an amount more than the annual MOOP threshold limit.

**C. The Plan Did Not Utilize a Network of Hospitals that Could Deliver the EHBs Covered By the Plan**

35.     Under the framework of modern managed healthcare, payors establish networks of healthcare providers to deliver covered health care benefits, and do so by contracting with providers for services at agreed-upon reimbursement rates.

36.     Payors must have adequate networks of providers who can care for their members and insureds in a given geographic area.  This concept is the essence of the American managed care delivery system.

37.     A network of hospitals is especially important to ensure that a payor's members and insureds have reasonable and timely access to emergency services and inpatient hospitalization because such life-saving care can only be provided by specialized facilities, staffed around-the-clock.  And that is why health insurers – as well as nearly all self-funded ERISA plans – maintain an adequate network of hospitals that can provide such services.

38.     UC Davis Health participates in many networks of hospitals that are maintained by established health insurers such as United Healthcare, Aetna, Blue Shield of California, and Anthem Blue Cross.  When UC Davis Health contracts with such health plans, it typically enters into separate agreements for hospital services, on one hand, and professional (physician) services, on the other.  And its standard practice is to contract with such payors for agreed-upon rates of payment for <u>both</u> hospital <u>and</u> physician services so that it is "in network" for all the services provided by UC Davis Health that the plan covers.

39.     Had Defendants simply chosen to partner with one or more major health insurers to administer its group health plan – as most large, reputable employers do – then Plaintiff would most likely have been in-network with the Defendants, and this dispute would not have arisen. The Plan, here, however, does not utilize a network of hospitals.  UC Davis Health never had an opportunity to contract with the Plan, because the Plan refuses to contract with hospitals.[3]

40.      The governing Plan document itself confirms that the Plan was not designed to utilize a network of hospitals.  The Plan <u>does</u> utilize a network of individual physicians who may provide physician services to beneficiaries and participants of the plan – but no network of hospitals.

41.     Tellingly, the Plan's section titled "Preferred Provider or Nonpreferred Provider" makes very clear that those terms  "Appl[y] to ***professional providers*** only."  (Ex. A at 15 (bold and italic emphasis in original).)

/ / /

---

[3] Effective January 1, 2022, Patient A switched coverage to Blue Shield of California, a health insurer whose network of hospitals includes UC Davis Health.  Payment for Patient's care for services rendered on or after this date is not disputed in this action.

42.     The word "professional" is significant: it refers to the healthcare services rendered by physicians or other licensed individuals.  The term "facility," in contrast, is used to describe the separate services rendered by a hospital or an ambulatory surgery center.  It is customary for professional services to be billed separately from facility services, even for the same patient encounter (such as a visit to the emergency room.)  In fact, the health care industry uses different billing forms for professional and facility services.  Professional services are typically billed on HCFA-1500 billing forms, whereas facility services are billed on UB-04 billing forms.

43.     Next, the Plan establishes that preferred providers belong to a "Preferred ***Provider Organization (PPO)"*** and that the PPO "accepts a ***negotiated rate*** for services rendered to ***covered persons***."  (*Id.*)  "In turn, the PPO has an agreement with the ***plan administrator*** or ***claims processor*** to allow access to ***negotiated rates*** for services rendered to ***covered persons***. The PPO's name and/or logo is shown on the front of the ***covered person***'s ID card."  (Ex. A at 15 (bold and italic emphasis in original).)

44.     Consistent with this, the Plan's Definitions section defines a "Nonpreferred Provider" as "A ***physician*** or other **individual** healthcare provider who does not have an agreement in effect with the ***Preferred Provider Organization*** at the time services are rendered." (Ex. A at 91) (Underline emphasis added).  "Preferred Provider Organization," in turn, is defined as an organization that "selects and contracts with certain professional providers . . ." (*Id*. at 92 (bold and italic emphasis in original).)  And "Preferred Provider" is defined as "a ***professional provider*** which has an agreement in effect with the ***Preferred Provider Organization (PPO)*** to accept a ***negotiated rate*** for services rendered to (Ex. A at 15 (bold and italic emphasis in original).)."  (Ex. A at 15 (bold and italic emphasis in original).)

45.     Patient A's Member ID card, which was imaged at the time of patient registration, confirms that the only Preferred Provider Organization used by the Plan is MultiPlan.  Under the MultiPlan logo are the words "Practitioner & Ancillary Only."  This phrase confirms that the MultiPlan PPO network covers "preferred" practitioners, e.g., professionals.

46.     As discussed below, Patient A's attending gynecologist (and other physicians who provided services to her) participated in (i.e., were "in-network") with MultiPlan.

9



47.     The only other logo on the card (other than that of Trustmark, the claims administrator for the Plan) is for a pharmacy network, US-Rx Care.

48.     Hospitals are not considered "ancillary" providers or "physician" providers.  They are "facility" providers.

49.     Significantly, MultiPlan also has a separate hospital network, of which Plaintiff is a part, under which the Hospital has agreed to accept payment for hospital services at a substantial percentage of its total charges.  But the Plan does not utilize that MultiPlan hospital network, and if it had, the Plan would likely have been obligated to pay Plaintiff at its contracted MultiPlan rate.

50.     The Plan's own definition of "Facility" and "Hospital" further confirms that the Plan does not utilize a network of hospitals.  (Ex. A at 86, 88.)  So do the headings in the main Schedule of Benefits.  (Ex. A at 7-16.)  The Schedule sets forth three separate payment levels: for "Facilities," "Preferred Provider[s]," and "Nonpreferred Provider[s]."  The term "preferred" is only used in conjunction with the term "provider," meaning physicians or other licensed individuals.  There are no "preferred facilities" or "nonpreferred facilities," in contrast.  There are simply "facilities."

51.     Individual physicians are incapable of providing 24-hour, around-the-clock inpatient care without the resources of an appropriate facility such as UC Davis Medical Center.  Nor are individual doctors' offices able to provide cancer surgery; subsequent hospitalization; or a course of same-day chemotherapy and radiation treatment in a physician-office setting.

52.     Because the Plan does not utilize any network of hospital facilities, there were no "network hospitals" and no "non-network hospitals." Any distinction between "network" hospitals and "non-network" hospitals was meaningless because the Plan itself makes no such distinction.

/ / /

1  Defendants openly admit that "the Plan had no hospital network." (Dkt. 9 at 9:16 (Memorandum

2  of Points & Authorities Supp. Defts. Mot. to Dismiss).)

3      **D.  Even When Permissible, Reference Pricing Requires Strict Guardrails to Prevent**

4          **Abuse**

5         53.    At a high level, a "reference-based pricing" approach eschews the use of provider

6  networks that deliver particular healthcare items or services in favor of offering a fixed level of

7  payment for those specific items or services.  Providers that agree to accept the reference payment

8  methodology are considered "in-network," whereas providers who do not are considered "out-of-

9  network."

10         54.    There is no one standard as to what "reference" must be used as long, as it is

11  determined in advance and knowable by the provider.  A fixed dollar amount, a multiple of

12  geographically-dependent Medicare rates, or metrics that estimate a hospital's "cost" for providing

13  a service are all examples of standard "references" that have been used by various plans.

14         55.    Reference pricing is controversial, and health care experts disagree whether it is

15  even an effective cost-control tool at all.  Critics also note that it imposes extreme health care costs

16  on patients who are the least able to afford it.

17         56.    Even the most ardent mainstream proponents of reference pricing agree that a

18  reference payment standard must be established and calibrated for *each individual item or service*.

19  The "reference" must be established in a manner that ensures that a sufficient number of quality

20  healthcare providers accept the reference price as payment in full.  Only then may a health plan

21  that utilizes reference pricing effectively encourage health plan members to "shop around" for

22  high-quality, cost-effective options for elective care.

23         57.    Historically, plans that have successfully utilized reference-based pricing do so on a

24  limited basis only.  They set a "reference price" for just a handful of high-cost medical procedures,

25  typically at hospitals.  Even these plans do not typically impose reference pricing for emergency or

26  other urgent or unscheduled services, or complex care for which significant variations exist from

27  patient to patient – such as cancer care.

28  / / /

58.     About ten years ago, California Public Employees' Retirement System (CalPERS) famously implemented reference pricing for joint replacement surgery (e.g., for a knee or hip) for members of its PPO plan.[4]  CalPERS announced that it would pay up to $30,000 to a hospital for performing such surgeries (excluding charges from surgeons and other physicians involved).

59.     Members who select a hospital or other facility that charged less than or equal to the established reference price of $30,000 would receive standard "in-network" coverage. CalPERS would cover 80% of the hospital's fee (up to or less than $30,000), while the member covered the other 20% – the member's cost-share – up to the member's annual maximum-out-of-pocket of $3,000.

60.     Members who select a hospital or facility that charged more than the reference price, in contrast, would be responsible for the entire balance.  Thus, CalPERS explains that a patient who went to a hospital that charged $40,000 for a knee replacement procedure would have to pay a $10,000 balance on top of normal cost-sharing under the plan ($3,000).[5]

61.     The $30,000 reference price used in this example was not set arbitrarily.  It was based on a comprehensive analysis of data showing what hospitals would actually accept. CalPERS tasked its claims administrator, Anthem, with compiling a list of hospitals across the country that set their price for the procedure in question at or less than $30,000 and which were hospitals of "acceptable quality" and with "sufficient geographic dispersion."[6]  In other words, CalPERS took great care to set a reference price based on available data that would ensure that its PPO members could, in fact, affordably obtain the procedure in question.

62.     CalPERS eventually expanded the list of reference-pricing procedures to include arthroscopic surgery and cataract surgery.[7]   But all other items and services, including hospital

---

[4] CalPERS Pension & Health Benefits Committee, June 18, 2013 report titled "Agenda Item 7," https://www.calpers.ca.gov/docs/board-agendas/201306/pension/item-7.pdf.

[5] Id.

[6] Id.

[7] Berkeley Center for Health Technology, Reference Pricing for Surgical Procedures, https://bcht.berkeley.edu/reference-pricing-surgical-procedures.  University of California, Berkeley researchers were apparently involved in researching and analyzing these issues.

1  care and cancer care covered by the CalPERS PPO plan, continue to be delivered through the

2  plan's network of providers, including in-network hospital providers.  (CalPERS utilized Anthem

3  Blue Cross' network of providers).

4         63.     The CalPERS reference-based plan was designed to have significant exceptions.

5  For instance, CalPERS did not impose reference pricing when a member was more than 50 miles

6  from the nearest hospital facility that accepted the price for the surgical procedure.  CalPERS also

7  provided exceptions where the patient's physician offered a clinical justification for using a high-

8  priced facility or hospital setting.[8]  Follow-up care, complications, or complex or unusual cases

9  were also excluded by CalPERS.  CalPERS also accompanied the rollout of this program with a

10  coordinated campaign of outreach to and education for its members.

11         64.     The CalPERS example underscores the significant limitations inherent in the

12  reference pricing model.  That model only works for discrete medical procedures that are typically

13  performed the same way, with little variation in technique.  As the researchers who analyzed the

14  CalPERS data warned, reference-based pricing "should not be applied to complex conditions that

15  have substantial differences in case mix severity."  Cancer falls squarely into that category.

16  Similarly, "[r]eference pricing should not be applied to emergency procedures or to individual

17  components of care that cannot be selected independently, such as laboratory tests conducted

18  during the course of a physician office visit."[9]

19         65.     This is why CalPERS's reference pricing structure excludes revision surgery after a

20  failed joint replacement – e.g., a complication arising from surgery – or complex bilateral

21  procedures.  Such complex care is delivered instead through CalPERS' traditional hospital

22  network.

23         66.     The CalPERS example – which was the primary basis around which the Agencies

24  fashioned their guidance – highlights the serious limitations of reference pricing.  Reference

25

26  _____

27  [8] Ann Boynton and James C. Robinson, Appropriate Use of Reference Pricing Can Increase Value, Health Affairs, July 7, 2015, https://www.healthaffairs.org/content/forefront/appropriate-use-reference-pricing-can-increase-value.

28  [9] *Id.*

13

FIRST AMENDED COMPLAINT

1  pricing was never intended to be applied indiscriminately.  Nor was it intended to substitute for an

2  actual network of hospitals.

3  **E.   The Plan At Issue Utilizes Reference Pricing At the Greater of Two Reference Points**

4        67.     CalPERS' careful design stands in stark contrast to the haphazard and

5  indiscriminate approach taken by the Defendants.  Defendants have set up a Plan that, in effect,

6  pays an extremely low and indiscriminate  "reference price" for <u>any and all</u> hospital-based

7  services.  They do so without considering whether quality hospital services will be accessible to or

8  affordable for plan members.  They also fail to consider whether their patients will have a

9  "choice" of in-network or out-of-network providers, much less whether patients can shop around.

10  This takes reference-based pricing to an extreme, with none of the safeguards inherent in

11  CalPERS' model.

12        68.     Defendants insist for the first time in this action that they don't utilize reference

13  pricing at all.  That is provably false.  The Plan pays based on the greater of two reference prices:

14  either 140% of the Medicare fee-for-service rate or 112% of a rough estimate of the hospital's

15  cost.  These two references are set forth in the definition of an "allowable claim limit":

16      *2.     Guidelines. The following guidelines will be used when determining allowable*
    *claim limits:*

17          *a.     Facilities. The allowable claim limit for claims by a facility, including but*
    *not limited to, hospitals, emergency and urgent care centers, rehabilitation and skilled*

18      *nursing centers, and any other health care facility, shall be the greater of (I) 112% of the*
    *facility's most recent departmental cost ratio, reported to the Centers for Medicare and*

19      *Medicaid Services ("CMS") and published in the American Hospital Directory as the*
    *"Medicare Cost Report" (the "CMS Cost Ratio"), or (II) the Medicare allowed amount*

20      *for the services in the geographic area plus an additional 20%.*

21  (Ex. A at 30.)

22        69.     While these benchmarks are not fixed dollar amounts, like the "$30,000" in the

23  CalPERS example, they are both calculated pursuant to specific formulas, and thus knowable in

24  advance.  For each reimbursement claim submitted by a hospital to the Plan, the Plan and its hired

25  administrators calculate the two benchmarks and determine which was higher.

26        70.     Each of the Explanation of Benefits (EOB) forms issued by the Plan's

27  administrators to Plaintiff included a "reason code," 'EP2,' that stated that the hospital's entire

28  */ / /*

1  charge for the service was not paid because "these charges exceed the plan's allowable claim

2  amount" – meaning the greater of the two benchmarks described above.

3      71.    The Plan's administrators thereafter denied each of Plaintiff's appeals on the sole

4  basis that the hospital's charges exceeded the "allowable claim amount," because the correct

5  reference price was purportedly correctly paid.

6      72.    Both benchmarks vary throughout the country based on hospital's estimated cost of

7  care, which in turn varies based on labor costs.

8      73.    For instance, there is not one unitary Medicare fee-for-service rate for a given

9  healthcare service throughout the entire country.  The rates paid by the federal Medicare program

10  vary throughout the country based on the wage index in the hospital's geographic location, such

11  that urban areas (which have higher labor costs) will receive higher Medicare reimbursement rates.

12  A benchmark based on 120% of Medicare fee-for-service rates will also necessarily vary this way.

13      74.    The other benchmark reflects the Plan's attempt to calculate what it "costs" for the

14  hospital to provide the service, using an estimate based on publicly available, aggregate cost data

15  that those hospitals report to state and federal regulators.[10]  The Plan tacks on an additional 12% to

16  this "cost" benchmark.  This too, will vary based on geography (for instance, urban versus rural),

17  because costs (including by not limited to labor costs) vary by region.

18      75.    In some instances, the 112% of cost reference price will be the higher of the two. In

19  others, the 120% of Medicare reference price will be higher.  The two references will result in

20  generally higher payments in urban areas, which have higher costs (including higher labor costs),

21  and somewhat lower payments in rural areas.  Hospitals in the same geographic region will tend to

22  have similar Medicare rates and similar labor costs.  Thus, the two reference prices will vary in a

23  predictable manner by region.

24  / / /

25  / / /

26  _____

27  [10] *See also* https://www.elapservices.com/blog/fighting-back-against-your-biggest-business-

28  challenge-healthcare-costs/ (explaining that the "cost" benchmark is based upon "information that
hospitals are required to report").

76.     The Plan engaged ELAP Services, LLC ("ELAP") to implement its aggressive reference-based scheme. ELAP bills itself as "[t]he leader in reference-based pricing,"[11] and claims to have "pioneered reference-based pricing in 2007 and we've been leading the way ever since."[12]

77.     The governing Plan document identifies ELAP Services, LLC as the "Designated Decision Maker (DDM)," with authority to impose reference pricing – at either the 120%-of-Medicare reference or the 112%-of-cost reference – upon hospital providers.

78.     Plaintiff's appeals were denied directly by ELAP, on ELAP letterhead, on the basis that Plaintiff could not be paid more than the reference price.

79.     ELAP's website openly touts the success of its reference pricing model.  A prominently featured page titled Reference-Based Pricing reads, in part[13]:

**What is reference-based pricing?**

Reference-based pricing (RBP) is a cost-containment strategy that uses an established benchmark, like Medicare, to determine what is paid for healthcare services. Self-insured businesses can add a reference-based pricing solution to their health plan and reduce annual costs by up to 30%. RBP providers review and audit medical bills, ***reprice them based on Medicare*** or ***some other benchmark like*** ***the actual cost reported by the hospital***, and pay a fair markup on those charges. As a result, employers and employees can save money on their healthcare spending.

Think of reference-based pricing as a bottom-up approach, starting at the bottom with a reference metric — often the actual cost or Medicare — then adding a fair profit margin to determine provider payment. This is contrary to the Preferred Provider Organization (PPO) system . . . .

**How does reference-based pricing from ELAP work?**

---

[11] https://www.elapservices.com/rbp-explained/ (blurb under "About Us").

[12] https://www.elapservices.com/about/ (under heading "The first of its kind").

[13] ELAP, Reference Based Pricing: Reference-based pricing explained | What is reference-based pricing? https://www.elapservices.com/reference-based-pricing/ (emphasis added); *see also* ELAP, Reference-based pricing: explained, https://www.elapservices.com/rbp-explained/ ("More than 12 years ago, we launched our reference-based pricing (RBP) solution with our very first client. Since then, we've helped more than 500 self-funded companies save millions on their healthcare — with most clients experiencing a 25-30% cost reduction.").

Reference-based pricing health plans set limits on paying healthcare providers for procedures and related healthcare costs. With ELAP's solution, the payments are based on actual costs from the providers (self-reported annually by law) and Medicare reimbursement rates as determined by the government.

After receiving care, ELAP:

- o   Audits the healthcare claim for errors and unexplained and excessive charges
- o   Identifies the actual costs of services and materials
- o   ***Reprices based on Medicare and actual costs***
- o   Determines equitable payment with a fair margin for the provider

80.     This description from ELAP's website aligns neatly with the two reference benchmarks utilized by the Plan in this instance.  There is no distinction between the kind of reference pricing loudly advertised by ELAP and the reference that the Plan hired ELAP to implement. Here, Defendants hired a well-known reference pricing company to "consider[] the Medicare reimbursement rate [and/]or the cost of service as a reference point" for any hospital service covered by the plan.[14]

81.     Nor is the Plan's use of the greater of two different reference prices a point of distinction.  The self-funded health plan at issue in *Salinas Valley Mem'l'l Healthcare Sys. v. Monterey Peninsula Horticulture, Inc.*, No. 17-cv-07076-VKD, 2018 U.S. Dist. LEXIS 202709 (N.D. Cal. Nov. 29, 2018), which was also alleged to have engaged in improper reference pricing, utilized the exact same pricing structure based upon the greater of two reference prices:

The Permitted Payment Level for charges by Hospitals and Affiliated Facilities (collectively, "Hospital Facilities") shall be based upon ***the greater of Medicare allowable reimbursement plus 40%* <u>or</u> *140% of the Hospital's costs reflected in the Hospital's most recent departmental cost ratio report*** to the Centers for Medicare and Medicaid Services ("CMS") and as published in the American Hospital Directory as the "Medicare Cost Report" (the "CMS Cost Ratio").

Civil Case No. 17-cv-07076 (N.D.Cal.), Dkt. No. 10-1, Defendants' Request for Judicial Notice in Support of Motion to Dismiss Complaint, at p. 64 of 103 (emphasis added).[15]

---

[14] https://www.elapservices.com/case-study/chelsea-senior-living/ (profiling ELAP "client").

[15] The pleadings in the *Monterey Peninsula* cases alleged that the Plan paid at 140% of Medicare. This was true because "Medicare allowable reimbursement plus 40%" was typically the greater of the two benchmarks in that case.  Here, in contrast, the cost-based reference metric, not the Medicare-based metric, was typically the greater of the two.

17

FIRST AMENDED COMPLAINT

**F.  Patient A Had No Choice But to Seek Care at a Hospital-Based Cancer Center Such As UC Davis Health**

82.     As anyone who has had cancer – or who has had a family member or friend with cancer – knows, the treatment of cancer is one of the most complex and cutting-edge areas of health care.  Cancer treatment is not provided "a la carte."   Rather, cancer patients typically receive a comprehensive treatment plan and undergo an entire course of care that may take months, if not years.  Frequently, as here, that course of care begins with hospital-based surgery, followed by a course of radiation and chemotherapy (often intravenous infusions).

83.     This is particularly true when it comes to the treatment of obstetric-gynecologic cancers like Patient A's.  OB/GYN cancers are considered difficult and challenging cases.  They are often very aggressive.  There are no individual physicians that practice solely in an office setting who can provide a complete course of care for OB/GYN cancer care.  For all intents and purposes, such care is practically unavailable under any health plan that offers only a network of individual health care practitioners.

84.     Dr. Rachel Ruskin, the obstetrician/gynecologist who was Patient A's primary attending physician, specializes in the treatment of various cancers unique to in women, and personalizes each patient's treatment plan through a variety of surgical approaches, chemotherapy regimens, targeted drugs, and immunotherapy as needed.

85.     Dr. Ruskin was in the MultiPlan network utilized by the Plan and available to Patient A as "in-network".  But Dr. Ruskin practices exclusively at UC Davis Health – whose hospital facilities and hospital outpatient clinics were excluded from the Plan's network by design.[16]  Patient A's care required the full resources of UC Davis Health's Cancer Center, yet the Plan did not offer Patient A any option to cover the full course of her cancer care on an in-network basis.  Instead, it deliberately exposed Patient A to the entire balance that it refused to pay.

/ / /

---

[16] UC Davis Health and its physicians contracted with the MultiPlan network for both facility services and physician services.  UC Davis Health would never contract with one side but not the other. The Plan, however, chose only to pay for access to MultiPlan's physician network.

86.     A review of the major components of Patient A's course of treatment at UC Davis Health confirms the unavailability of such care within the Plan's inadequate network.  First, Plaintiff's records reflect that Trustmark expressly authorized Patient A's gynecologic surgery at UC Davis, as well as the subsequent 4-day inpatient hospital stay.  Neither the surgery nor the inpatient hospital stay could have been provided within the Plan's network.  Again, the Plan admits that it had no network of hospital facilities that could have provided this care.

87.     The above is true for many other kinds of care required for cancer.  Even the placement of a port in the patient's body for purposes of safely administering chemotherapy is a surgical procedure that must be performed in a hospital facility.

88.     Ironically, an August 6, 2021 letter from Trustmark approving an "Inpatient Hospital" stay at the "Surgical- Acute" level advised Patient A that, "Use of in network providers will maximize the member's available benefits."  There were no in-network hospitals, of course, that could render the approved and medically necessary care – and the Plan and its administrators knew it.

89.     The Plan was <u>obligated</u> to offer hospitalization as a covered benefit.  Otherwise, its members could not satisfy ACA's individual mandate, and the Plan would have been assessed fines and penalties by the federal government.  Longstanding guidance from the Internal Revenue Service (IRS) takes the position that a health plan fails to offer "minimum value" to its participants and beneficiaries if it <u>does not cover</u> inpatient hospitalization.[17]  The Plan here purported to cover hospitalization, yet it provided no way for Patient A to receive it without being exposed to substantial financial liability (far in excess of the ACA's MOOP limit).

90.     Patient A next received a simultaneous course of chemotherapy and radiation, which were administered <u>on the same day</u> – one in the morning and the other in the afternoon.

---

[17] ACA required health insurance issuers and group health plans alike to offer plans that meet the "minimum value" standard, meaning that they "cover[] at least 60 percent of the total allowed cost of benefits that are expected to be incurred under the plan."  IRS.gov, Minimum Value and Affordability, https://www.irs.gov/affordable-care-act/employers/minimum-value-and-affordability.  Minimum value is required for a plan to be considered minimum essential coverage, and thus compliant with ACA's individual mandate.

FIRST AMENDED COMPLAINT

1  Such treatment can <u>only</u> be provided in a cancer center facility like the one operated by Plaintiff.

2  A physician's office will not suffice.  Again, though Plaintiff's primary oncologist was in-network

3  with the Plan, she did not (and could not) offer this course of treatment <u>except</u> through the

4  Hospital and its Cancer Center.

5        91.     Plaintiff repeatedly reached out to the Plan's administrator, Trustmark, to obtain

6  authorization.  Trustmark sent an August 27, 2021 "pre-coverage determination" letter to "UC

7  Davis Health-Dr. Rachel Ruskin," which stated, without qualification, that with respect to the

8  chemotherapy, "[t]he covered services will be payable at 100%. The plan has a deductible of

9  $2700."  The representation that the Plan would pay for the covered chemotherapy services "at

10  100%" was objectively false.

11       92.     When Plaintiff inquired about the radiation treatment, it was generally informed

12  that no authorization was necessary.

13       93.     The Plan placed Patient A in an impossible situation.  It was, through the MultiPlan

14  physician-only network, contracted with Patient A's oncologist, and authorized her entire course

15  of cancer care (or informed her that no authorization was necessary, as to certain services) yet

16  simply refused to access a network of hospitals that could affordably deliver such care to her

17  (including the MultiPlan facility network in which Plaintiff participated).  Defendants then stuck

18  Patient A with the bill.

19       94.     This is not what Congress intended when it enacted the Affordable Care Act with

20  the goal of making care affordable.

21       95.     It was impossible for Patient A to obtain her course of treatment within the stunted,

22  individual-practitioner-only network available under the Plan.

23       96.      It would also have been impossible for Patient A to "shop around" for her care at

24  an "in-network" facility.  Not only did the Plan forego a network of hospitals, but as explained

25  below, no hospital in the Sacramento region would accept the Plan's extremely low reference

26  price.  The Plan likewise did nothing to ensure there was a sufficient geographic distribution of

27  hospitals that met enumerated quality standards.  Not only did the Plan lack such quality

28  / / /

1  standards, but quality hospitals, including UC Davis Medical Center, would not accept the

2  reference price as payment in full.

3       97.     The entire balance for Patient A's care above the unsustainably low reference price

4  chosen by the Plan was necessarily the patient's responsibility, by design.

5  **G. The Plan's So-Called "Claim Review And Audit Program" Routinely Leaves Patients**

6       **With Large Unpaid Balances For Medical Care**

7       98.     To compensate for its structural choice not to utilize a network of hospitals, the

8  Plan implemented what it called a "Claim Review and Audit Program."

9       99.     To be clear, the Plan did not actually do an "audit" of Plaintiff's reimbursement

10  claims, or any other hospital's claims.  Nor are individual claims selected by audit.

11       100.     Rather, on information and belief, Defendants direct every bill submitted by

12  hospitals, including Plaintiff's, to be "priced" by ELAP.  Though styled as an audit, every single

13  hospital claim was instead paid based on one of two reference points: the Medicare allowed

14  amount plus an additional 20%; or, instead, based on an estimate of 112% of what it would have

15  cost for the hospital to provide the service in question, which ever was greater.  Put simply,

16  Defendants looked to two separate reference prices, rather than one.

17       101.     As a practical matter, Defendants "priced" each of Plaintiff's claims using its

18  reference price based on 112% of the hospital's "costs", which is option (I) described on the

19  language quoted in Paragraph 68, *supra*.

20       102.     Plaintiff never agreed to be subject to the Plan's pricing methodology.  It never

21  agreed to accept either 120% of Medicare or 112% of its "costs." To the contrary, there was no

22  agreement between Plaintiff and the Plan. Plaintiff thus never agreed to discount its charges for the

23  care rendered to Patient A.

24       103.     On information and belief, no other hospitals in the Sacramento geographic area –

25  or indeed, anywhere – have ever agreed up-front to accept the Plan's methodology as payment in

26  full.

27       104.     Hospitals typically contract with major insurers at rates that are equivalent to

28  somewhere between 250% and 400% of Medicare, and sometimes as high as 500-600%,

1  depending on the hospital, region, and service.  This estimate accounts for the contracted rates that

2  hospitals – and health plans – are required to publicly disclose pursuant to recent HHS "price

3  transparency" regulations.

4         105.    Medicare rates are widely recognized to pay less than the cost of care.  According

5  to statistics compiled by the California Hospital Association, Medicare rates cover 75 cents for

6  every dollar of hospital care provided in California.[18]  Medi-Cal rates cover even less, especially

7  fee-for-service Medi-Cal rates.  Precisely because government reimbursement rates do not cover

8  the cost of care, hospitals like Plaintiff's must compensate by negotiating higher rates from

9  commercial sources of payment.

10         106.    For all these reasons, neither Plaintiff nor other hospitals in the greater Sacramento

11  region would willingly accept the low reference-based rates offered by the Plan.

12         107.    Furthermore, after calculating extremely low reimbursement amounts – here, only

13  18.7% of Plaintiff's bill – Defendants assign artificially low co-payments, deductibles and co-

14  insurance amounts, based on the portion of the calculated amounts, as the patient's "financial

15  responsibility."

16         108.    This practice of calculating relatively small patient responsibility amounts is

17  misleading: it disregards the remaining balance of unpaid healthcare charges – here, 81.3% of

18  Patient A's total bill.  Defendants ignore that the large unpaid balance for the Hospital's services

19  remains the patient's responsibility.

20         109.    Indeed, the Plan itself provides that plan beneficiaries "must pay" not only for "any

21  normal cost-sharing features of the Plan, such as deductibles, coinsurance and copayments," but

22  also "any amounts otherwise excluded or limited according to the terms of the Plan." (Ex. A at

23  30.)  This includes amounts that exceed "allowable claim limits" – here, the unpaid balance of

24  Patient A's healthcare bills.

25  / / /

26  / / /

27  _____

28  [18] March 15, 2023 letter from CHA to Governor Gavin Newsom, https://calhospital.org/wp-content/uploads/2023/04/Hospitals-on-the-Brink_State-Letter_2023_FINAL-VERSION.pdf.

110.     Moreover, when Patient A came to UC Davis Health for care, Patient A explicitly agreed to be responsible for all amounts that her health coverage did not pay.  Specifically, the Patient agreed to and signed the following:

**8. FINANCIAL AGREEMENT**: I agree to pay the Regents of the University of California for professional, hospital and clinic services, including UCDHS physician services, in accordance with the Charge Master in effect on the date of service. I also agree to pay for other professional services provided by other physicians at UCDHS. Should the account be referred to an attorney or collection agency for collection. I agree to be responsible for all collection fees (attorney's fees, costs and collection expenses) in addition to any other amounts due. Unpaid accounts referred to outside agencies for collection also bear interest at the then current legal rate.

111.     Defendants are fully aware that Patient A remains responsible for the unpaid balance, which is why they (either directly or through consultants) hire aggressive "patient advocates" and law firms to fight health care providers who seek to collect their charges from patients.  By distracting from the true issue of the unpaid bills, Defendants hope to divert attention away from their own responsibility comply with Affordable Care Act requirements.

112.     On its webpage, ELAP advertises to employers that they can "Lower your healthcare spend by up to 30%."

113.     In contrast, health care researchers have estimated that taking traditional reference pricing approach (e.g., the "CalPERS approach") to its fullest extent would result in just a 5% reduction in the total spending for a given health plan.[19]

114.     The only reason ELAP can boast tremendous "savings" of "up to 30%" is by denying fair payment to hospitals and imposing extraordinary liability upon patients.  This is precisely what the Plan hired ELAP to do. This misconduct violates a core protection of the Affordable Care Act: the annual MOOP limit.

/ / /

/ / /

---

[19] *Despite Buildup, Reference Pricing Savings Modest for Medical Services*, National Institute for Health Care Reform, https://www.nihcr.org/news-releases/news-reference-pricing2/ (October 9, 2014) ("Applying Reference Pricing to a Broad Set of 'Shoppable' Inpatient and Ambulatory Services Might Save 5 Percent of Total Spending While Adding Significant Complexity for Patients").

FIRST AMENDED COMPLAINT

1   **H.  Defendants Failed to Comply with a Key ACA Protection: the Annual MOOP**

2       **Threshold of $8,550 in Calendar Year 2021**

3       115.    One of the main goals of ACA is to limit patients' out-of-pocket expenditures for

4   key health care services.  Thus, ACA imposes an annual maximum out-of-pocket limitation,

5   known as the MOOP threshold.  An individual patient cannot be liable for more than the MOOP

6   threshold in any given calendar year for cost-sharing for EHBs.  *See generally* 42 U.S.C.

7   § 18022(c) (PPACA Section 1302(c)).

8       116.    The federal Agencies tasked with implementing and administering ACA have set

9   the MOOP threshold for each year beginning in 2014.  For instance, the MOOP threshold for an

10  individual was $6,350 in calendar year 2014.[20]  The threshold was set by the Agencies for each

11  year thereafter, increasing slightly each year.  Relevant here, the threshold was $8,550 for an

12  individual in calendar year 2021.

13      117.    While the Agencies also established a separate MOOP threshold for families

14  (identified via the unwieldy term "coverage other than self-only coverage"), the <u>individual</u>

15  threshold is applicable to Patient A.  In a 2015 rulemaking, the Agencies clarified that a patient's

16  cost sharing for EHBs "may never exceed the self-only annual limitation on cost sharing."[21]  As a

17  result of this clarification, an insurer or health plan cannot "require <u>any individual</u>, including those

18  with family coverage, to spend more than the individual out-of-pocket limit established under the

19  Act."  *Fisher v. Aetna Life Ins. Co.*, No. 16-CV-144 (RJS), 2020 WL 5898788, at *4 (S.D.N.Y.

20  Oct. 5, 2020) (emphasis added), aff'd, 32 F.4th 124 (2d Cir. 2022).

21      118.    As noted above, EHBs are defined broadly and specifically to include all the

22  services provided to Patient A.  Thus, Defendants were required to ensure that all EHB-related

23  expenditures above the $8,550 threshold in calendar year 2021 were covered by the Plan.

24  / / /

25

26  ───────────────

27  [20] Patient Protection and Affordable Care Act; Exchange and Insurance Market Standards for 2015 and Beyond; Final Rule, 79 Fed. Reg. 30,240 (May 27, 2014).

28  [21] Patient Protection & Affordable Care Act; HHS Notice of Benefit & Payment Parameters for 2016, 80 Fed. Reg. 10,750, 10,824 (Feb. 27, 2015).

1   **I.   Because the Plan Chose Not to Utilize a Network of Hospitals, the *Entire Unpaid***

2   ***Balance* for Patient A's Care Counted Towards the $8,550 MOOP Threshold**

3       119.   As noted above, PPACA Section 1302(c) mandates that patients' cost-sharing for

4   EHBs must not exceed the annual MOOP threshold.  Section 1302(c)(3) says that "[t]he term cost-

5   sharing <u>includes</u>—(i) deductibles, coinsurance, copayments, or similar charges; <u>and</u> (ii) <u>any other</u>

6   <u>expenditure required of an insured individual with respect to essential health benefits covered</u>

7   <u>under the plan</u>."  42 U.S.C. § 18022(c)(3)(A) (emphasis added).

8       120.   Excluded from the statutory definition of "cost sharing" are "premiums," "balance

9   billing amounts <u>for non-network providers</u>," and "spending for non-covered services."

10   *Id*. § 18022(c)(3)(B) (emphasis added).

11       121.   The statute thus confirms that balance billing amounts – like the $323,006.47 owed

12   by Patient A – <u>must</u> count towards the annual cost sharing (MOOP) threshold <u>unless</u> they are

13   charged by "non-network providers."  The statutory definition of "cost sharing" is inclusive,

14   excluding only the categories of expenses that are <u>not</u> included.

15       122.   Again, <u>there are no "network hospitals" or "non-network hospitals" when it comes</u>

16   <u>to this Plan</u>.  The Plan simply does not utilize a network of hospitals.  The balance bills for the

17   care that Plaintiff rendered to Patient A, thus, qualify as "cost sharing" under Section 1302(c)(3).

18       123.   This interpretation is further confirmed by Section 1302(c)'s implementing

19   regulation.  45 C.F.R. § 156.130.  Subsection (a) reiterates PPACA's annual limitation on cost-

20   sharing.  Subsection (c) of the regulation then confirms that plans may <u>choose</u> to utilize a network

21   of providers, or alternatively, <u>it may choose not to</u>.  But if a plan chooses not to use a network of

22   providers, then it cannot take advantage of the following "special rule":

23       **(c) Special rule for network plans**. In the case of **a plan using a network of**
    **providers**, <u>cost sharing paid</u> by, or on behalf of, an enrollee <u>for benefits provided</u>

24       **outside of such network** *is not required to count* toward the annual limitation on
    cost sharing (as defined in paragraph (a) of this section).  45 C.F.R. § 156.130(c)

25       (emphasis added).

26       45 C.F.R. § 156.130(c) (emphasis added); *accord* Patient Protection and Affordable
    Care Act; HHS Notice of Benefit and Payment Parameters for 2016, 80 FR 10,750,

27       10,824 (clarifying "technical correction").

28   / / /

124.     If a plan uses a network of providers (such as a network of hospitals), then balance billing amounts paid by a plan enrollee that were charged by providers "outside of such network" is not required to count towards the annual cost sharing (MOOP) limit.

125.     Conversely, if there <u>is no network</u> of hospitals, then care cannot be provided "outside of such network."  This is because the plan does not "us[e] a network of" such hospitals.

126.     It would also not be enough for a plan to have a partial network of providers who provide only some, but not all, of the EHBs covered by the Plan.

127.     Consider a hypothetical plan that covers emergency services, inpatient hospital care, and acupuncture, but which offers a "network" consisting solely of acupuncturists.  That plan may be viewed as utilizing a network of acupuncturists, but not a network of providers for purposes of emergency and hospital care.   In this scenario, there might be "out-of-network" acupuncturists, but there are no "out-of-network" hospitals.

128.     In guidance dated February 20, 2013, the federal Agencies confirmed this view of what it means to utilize a "network."  *See* FAQs About Affordable Care Act Implementation (Part XII), Q3, available here.  Where a health plan is required to cover a service but "does not have in its network a provider who can provide the particular service," the Agencies explained, the plan "must cover the item or service when performed by" providers <u>not</u> in its network.  (*Id.*)

129.     Similarly here, it is not enough to have a network of physicians, but not a network of hospitals that can provide hospital-based care.  Because the Plan does not use a network of hospitals, the "special rule" set forth in Section 1302(c) does not apply, and the Plan must count all cost-sharing, including hospitals' balance bills, towards the annual MOOP limitation.

130.     The term "network" is not actually defined by the Affordable Care Act or its implementing regulations.  Nor are the terms "non-network provider," "out-of-network provider," "network plan," or "a plan using a network of providers."

131.     As explained, health plans must enter into contracts with many kinds of providers, not just physicians, in order to ensure that the benefits offered by the plan are actually available.  It is certainly UC Davis Health's standard practice to contract with plans for both physician and hospital services, so that all services can be rendered on an in-network basis.

132.   This is consistent with the widely held expectation across the health care industry that any network of providers <u>will *necessarily include* hospitals</u>.  For instance, the Glossary of common health care terms maintained by HHS as part of the HealthCare.Gov site (which was created pursuant to ACA to help patients understand how their care works) defines a "network plan" as "[a] health plan that contracts with doctors, ***hospitals***, pharmacies, ***and other health care providers*** to provide members of the plan with services and supplies at a discounted price."[22]  In other words, a "network plan" is one that explicitly includes a network of hospitals.

133.   Another page on HealthCare.Gov describes the various plan types that are available for purchase, such as HMO, PPO, POS, and EPO-type plans.  Again, each of these kinds of plans is described as having a "network of doctors, ***hospitals***, pharmacies, ***and other medical service providers***."[23]

134.   HealthCare.Gov also offers a more detailed informational brochure titled, "What You Should Know About Provider Networks."  On the first page is the heading, "What is a provider network?"  The answer is: "A provider network is a list of the doctors, other health care providers, ***and hospitals*** that a plan contracts with to provide medical care to its members."[24]

135.   So while "out-of-network providers" are by definition providers outside the network, a network plan includes all kinds of providers, including hospitals, that are needed to deliver the services covered by the plan.

136.   Even ELAP maintains a Glossary of healthcare terms on its website ("to help you navigate the maze of modern healthcare and confusing terminology") that contains the following definitions:

**Managed Care**

A type of health insurance that has contracts with healthcare providers ***and medical facilities*** to care for members at reduced costs. The providers make up the network.

. . . .

[22] https://www.healthcare.gov/glossary/network-plan/.

[23] https://www.healthcare.gov/choose-a-plan/plan-types/.

[24] https://www.cms.gov/marketplace/outreach-and-education/what-you-should-know-provider-networks.pdf.

**PPO (Preferred Provider Organization)**

With a PPO, the health plan contracts with doctors ***and hospitals to create a network of providers for the members to use***. Those going outside that network for care pay more.

137.     The term "non-network provider" as used in Section 1302(c)(1)(B) is ambiguous. For all the reasons explained, there is no clear and accepted understanding of what it means to be a "non-network provider" in the situation where a network simply includes ***no providers*** that are in the plan's network who can render a particular kind of service or benefit covered by the health plan.   That is particularly true here, where the most crucial parts of the patient's complex cancer treatment plan could not have been rendered solely by individual practitioners.

**J.   The Annual MOOP Requirement Applies to Self-Funded Plans**

138.     When Congress passed the Affordable Care Act, it ensured that the annual limitation on cost sharing applied to ERISA-governed self-funded group health plans like the Plan.

139.     Section 2707 of the Public Health Service Act ("PHS Act") is captioned "Comprehensive health insurance coverage."  42 U.S.C. §300gg-6.  Section 2707 is found in title XXVII of the PHS Act. Subsection (b) of the statute provides:

> *(b) Cost-sharing under group health plans*
> A group health plan shall ensure that any annual cost-sharing imposed under the plan does not exceed the limitations provided for under paragraphs (1) and (2) of section 1302(c).

140.     Defendant The Chefs' Warehouse, Inc. Employee Benefit Plan is a group health plan within the meaning of ERISA and ACA.  *See* 42 U.S.C. § 300gg-91(a)(1).

141.     ACA directly amended ERISA itself, as well.  Section 715 of ERISA, (29 U.S.C. § 1185d), which was added by PPACA Section 1563(e), incorporates provisions of part A of title XXVII of the PHS Act into ERISA.  As noted above, Section 2707 is found in title XXVII, part A of the PHS Act.  Section 2707 therefore applies directly to self-funded ERISA plans. *See, e.g.*, *King v. Blue Cross & Blue Shield of Illinois*, 871 F.3d 730 (9th Cir. 2017) (confirming that the ACA directly amended ERISA, and that the provisions of part A of title XXVII of the PHS Act are incorporated into ERISA).

/ / /

142.    Accordingly, Defendants were required to pay the entire unpaid balance for Patient A's care once the $8,550 MOOP threshold was met for calendar year 2021.

143.    Plaintiff is presently unaware whether Defendants assigned any other cost sharing amounts to Patient A prior to the point in calendar year 2021 when Patient A received services at UC Davis Medical Center. Plaintiff intends to seek such information in discovery.

**K.   The Plan's Express Terms Incorporate ACA's Statutory MOOP Requirements**

144.    Under a heading titled "Conformity with Statute(s)," the governing Plan document provides, "Any provision of the ***Plan*** which is in conflict with statutes which are applicable to the ***Plan*** is hereby amended to conform to the minimum requirements of said statute(s)."  (Ex. A at 75 (emphasis in original).)

145.    The Plan's provisions are in violation of the requirements of PPACA Section 1302 and PHS Act Section 2707, among other statutes.

146.    Specifically, in the Schedule of Benefits, the Plan contains an Out-of-Pocket Expense Limit, described as "the most the covered person could pay in a year for covered services."  (Ex. A at 7.)  However, the only out-of-pocket expenses that count towards the Expense Limit are "deductible, coinsurance, copays, and prescription drug cost-share" amounts.  (*Id*.)

147.    The Out-of-Pocket Expense Limit has another flaw.  It states, "The following charges do not apply to the out-of-pocket expense limit and are never paid at 100%: . . . "expenses in excess of ***allowable claim limit***."  (*Id*. (emphasis in original).)

148.    As explained above, the "allowable claim limit" for hospitals and other facilities is defined as either 120% of Medicare rates or the hospital's costs plus 12%.

149.    The portion of a hospital's bill for covered EHB services over "allowable claim limit" is also known as the balance bill, for which the patient remains responsible.  Again, the Plan itself says that beneficiaries "must pay for any normal cost-sharing features of the Plan, such as deductibles, coinsurance and copayments, **_and any amounts otherwise excluded or limited according to the terms of the Plan_**."  (Ex. A at 30 (emphasis added).)

/ / /

/ / /

150.    As noted above, amounts above "allowable claim limits," such as Patient A's tremendous balance bill, are excluded under the terms of the plan, and are Patient A's responsibility to pay.

151.    The Out-of-Pocket Expense Limit provision thus violates Section 1302 and Section 2707 because it does not count balance bills for hospital services towards the annual out-of-pocket limit. This is even though the Out-of-Pocket Expense Limit provision – as well as other provisions of the Plan – explicitly make the patient liable for paying those amounts.

152.    Accordingly, under the Plan's Conformity with Statutes provision, the Out-of-Pocket Expense Limit provision of the plan is automatically "amended to conform to the minimum requirements of" Sections 1302 and 2707.

**L. Ten Years of Federal Guidance Establishes that Defendants Failed to Establish a Network of Hospitals For Purposes of Section 2707**

153.    Beginning in 2013, the three federal Agencies issued extensive guidance confirming at Sections 1302 and 2707 apply to self-funded group health plans, including:

a.    FAQs About Affordable Care Act Implementation (Part XII), Q1 and Q2 (February 20, 2013), available here.[25]

b.    FAQs About Affordable Care Act Implementation (Part XVIII), Q2, Q3 and Q4 (January 9, 2014), available here.

c.    FAQs About Affordable Care Act Implementation (Part XIX), Q2 and preamble, and Q4 (May 2, 2014), available here.

d.    FAQs About Affordable Care Act Implementation (Part XXI) (October 10, 2014) (entire document), available here.

e.    FAQs About Affordable Care Act Implementation (Part 31), Q7 (April 20, 2016), available here.

f.    FAQs About Affordable Care Act Implementation (Part 55), Q5 (August 19, 2022), available here.

---

[25] Each of the Agencies promulgated identical versions of this regulatory guidance on their own websites. For consistency, All of these links are to the versions issued by the Department of Labor.

154.    The Agencies' extensive guidance (together, the "Guidance') is incorporated

hereby by reference.

155.    When ACA was first implemented, there was no guidance on how the law's annual

MOOP limitation might interact with a reference-based pricing model.

156.    On May 2, 2014, apparently motivated by the positive reports of CalPERS'

reference pricing model, the Agencies issued their FAQs, Part XIX, which "invite[d] comment on

the application of the out-of-pocket limitation to the use of reference based pricing."

157.    In their invitation to comment, the Agencies stressed that they were "concerned that

such a pricing structure [e.g., reference pricing] *may be **a subterfuge** for the imposition of*

*otherwise prohibited limitations on coverage*, *without ensuring access to quality care and an*

*adequate network of providers*."

158.    The Agencies were right to be concerned.

159.    Based on publicly available records on the DOL's website, approximately thirty-

two interested parties submitted comments by the August 1, 2014 deadline, drawn from a wide

cross-section of interested stakeholders from all corners of the health care industry, including

health plans, providers, consumer advocacy groups, and even the so-called "reference-based

pricing industry."[26]

160.    Kaiser Permanente, for instance, wrote that they "share[d] the Departments

[Agencies]' concerns that broad application of reference-based pricing, *without regard to quality*

*care or reasonable access to providers* would result in increased out-of-pocket costs for

members."[27]  If reference-based pricing was implemented incorrectly, patients "could pay an

unreasonably high share of costs."  Kaiser also expressed concern that allowing reference pricing

---

[26] While Plaintiff has not identified any formal index of the comment letters submitted, each is publicly available on US DOL's website and can be accessed by navigating a web browser to "https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/faq-xix/000XX.pdf" – where "XX" are two digits that correspond a number between 01 and 34.  Some commenters submitted multiple comments.

[27] Kaiser Permanente, August 1, 2014 letter titled Comments to Reference-Based Pricing FAQ, https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/faq-xix/00032.pdf (italic emphasis in original).

1  would permit "unreasonably low reimbursement driven by unsustainably low provider pricing,"

2  which would "caus[e] unreasonable cost-shifting to consumers."  Kaiser advocated for a series of

3  safeguards to prevent abuse of reference pricing plans, such as ensuring access to providers and

4  enforcing quality standards.

5      161.    Other commenters emphasized the narrow and limited nature of health care

6  services that were appropriate for reference pricing.  For instance, the American Cancer Society's

7  Cancer Action Network (CAN) submitted a formal comment letter stating that "[g]iven the

8  complexities and uniqueness of cancer care, we believe that reference pricing may not be

9  appropriate for cancer treatment at this time."[28]

10     162.    Like many other commenters, the American Cancer Society CAN believed that

11 services subject to reference pricing must be ones "for which a patient can reasonably 'shop

12 around,'" and "the reference price set by the plan must be accepted by an adequate number of

13 providers."  Thus, "[m]ost cancer care does not lend itself to reference pricing."  The American

14 Cancer Society CAN advocated for its own list of significant safeguards, which included not only

15 quality and access safeguards, but an easily accessible exceptions process.[29]

16     163.    Companies with business models identical or similar to ELAP also responded to

17 the Agencies' request for comment.  For instance, one Sterling Boon[30] submitted a comment in a

18 May 7, 2014 email titled "Response to DOL asking for comment on Reference Based Pricing" that

19 stated, among other things, that "I have been covered under a reference based pricing model since

20 January 1, 2014 . . . The model works and works well. Hospitals should no longer be able to shove

21

22 [28] American Cancer Society Cancer Action Network, July 16, 2014 letter titled Comments on

23 Department of Labor FAQs about the Affordable Care Act Implementation (Part XIX),
   https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-

24 comments/faq-xix/00004.pdf (emphasis added).

25 [29] *Id*.; *see also* August 1, 2014 comment letter from Community Catalyst,
   https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-

26 comments/faq-xix/00012.pdf.

27 [30] A biography of Mr. Boon can be found here: https://biography.omicsonline.org/united-states-of-
   america/cobra-maintenance-lp/r-sterling-boon-293715.  An overview of The Boon Group's

28 reference-based pricing can be found here: https://www.boongroup.com/blog/self-funding-and-
   reference-based-pricing-an-overview/.

FIRST AMENDED COMPLAINT

illogical high pricing down the publics [sic] throat. . .  Reference based pricing is the future of healthcare."  And like ELAP does today, Mr. Boon boasted in his comment that "we are saving 30% or more on our cost of coverage" due to reference pricing.[31]

164.    Similarly, a company called ACS Benefit Services, Inc., a third party administrator to self-insured health plans, enthusiastically submitted a comment letter to inform DOL about a "new type of RBP [reference based pricing]" that, according to ACS, was not a "subterfuge for the cost limitations imposed by the ACA."[32]  ACS explained that "[t]he plan does not utilize a network of providers" and that payment for all services "is defined by reference to a  reasonable, objective standard determined by the plan, such as a percentage (e.g. 150%) of the amounts paid by Medicare . . . ." – a refrain that should be familiar to anyone who visits ELAP's website today.

165.    That commenters responding to the Agencies' request for comments on reference-based pricing plan made claims <u>virtually identical</u> to those that ELAP does today underscores the conclusion that the Plan (which hired ELAP to engage in a nearly identical scheme) engaged in reference pricing with respect to Patient A's reimbursement claims.

166.    Last, commenters from the provider and patient communities were extremely worried that patients would be exposed to significant out-of-pocket liability.

167.    A representative from a health care billing company, for instance, commented that "if reference-based pricing is going to be allowed, there MUST be a way to protect the consumer so that they are not subjected to huge medical bills due to lack of proper notification of this pricing method by their plans.  If this is not done there will be more consumers filing for bankruptcy due to the inability to pay their medical bills."[33]

---

[31] May 7, 2014 email comment submitted to DOL by Kristin Goodale of The Boon Group, replying to earlier email comment by Sterling Boon, https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-comments/faq-xix/00002.pdf.

[32] July 29, 2014 comment letter by ACS Benefit Services, Inc., https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-comments/faq-xix/00006.pdf.

[33] June 8, 2014 email from Theresa Wilson of Practice Synergy, LLC, https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-
(footnote continued)

168.     A representative of Santa Barbara, CA-based Cottage Health System submitted a comment to emphasize that "first and foremost the consumer/patient must be protected."[34]  She was  worried that "the difference between the reference price and the expected payment will be a burden to the patient above and beyond their out-of-pocket limits for in-network providers."  The three-hospital Cottage Health System, which, like Plaintiff, maintained contracts with many established health care payors, also expressed concern that "[l]ayering reference-based pricing on top of [hospitals'] already negotiated contracts hurts hospitals that in good faith have signed contracts to be included in a health plan's network."

169.     Similarly, the Consumers Union, a group affiliated with Consumer Reports, advocated for a long list of consumer protections, including "[a]n adequate number of providers accepting the reference price near enrollees' residences or workplaces to provide reasonable access" and "[r]easonable wait time standards for providers accepting the reference-based price."[35] The Consumers Union warned that "[i]f these consumer protections are not in place, consumers could find themselves with an unexpectedly large medical bill for a reference-priced procedure." The group also cautioned that these protections "must be in place and operational before removing [existing] protections, such as . . . out-of-pocket maximums" that were available to consumers.

170.     The Consortium of Citizens with Disabilities (CCD) likewise warned that "[m]ost likely, patients will only learn of the differences and their subsequent cost-sharing obligations after a procedure for which they are billed for the remainder of the price."[36]  Observing that "[r]eference pricing is sometimes used to limit networks of providers and avert cost-sharing rules,"

---

comments/faq-xix/00003.pdf.

[34] July 31, 2014 letter from Tiana Riskowski of Cottage Health System, https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/faq-xix/00034.pdf.

[35] August 1, 2014 letter from DeAnn Friedholm, Director, Health Reform for Consumers Union, https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/faq-xix/00021.pdf.

[36] August 1, 2014 letter from CCD Health Task Force Chairs, https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/faq-xix/00029.pdf.

FIRST AMENDED COMPLAINT

including the "potential to avoid ACA out-of-pocket limits," the CCD warned that "[c]onsidering 'in-network' only those providers that accept the reference price will further limit provider networks and exclude providers who provide specialized services."  The writers therefore recommended that the Agencies not make <u>any</u> exception to ACA's cost-sharing rules for reference-based pricing – such that the MOOP limitation would apply in <u>all</u> circumstances.

171.   Ultimately, after considering all the comments submitted, the Agencies issued their FAQs, Part XXI, which established clear and enforceable guardrails around the use of reference pricing.  The Agencies announced that a plan that "utilizes reference-based pricing (or similar network design)" <u>must</u> use "<u>a reasonable method</u>" to "ensure that it provides adequate access to quality providers at the reference-based price."

172.   The Agencies proposed multiple guardrails for the use of reference pricing.  These guardrails require that the plan reasonable <u>access</u> to providers at the reference price; that the plan ensure that a sufficient number of <u>quality</u> providers accept the reference price; and that plan has a process in place to make <u>exceptions</u> to reference pricing.  Together, these guardrails comprise a "reasonable method" of employing reference-based pricing.  It appears that the Agencies largely adopted the recommendations made by Kaiser Permanente, the American Cancer Society CAN, and other reputable commenters in this regard.

173.   The contours of a "reasonable method" – and Defendants' failure to use such a reasonable method – are discussed in more detail in Section M below.

174.   In subsequent years, the Agencies continued to reiterate, in more forceful terms, that a reference-based pricing plan model must follow the guidance set forth in FAQ XXI.

175.   On April 20, 2016, the Agencies issued FAQ Part 31, which explained in no uncertain terms:

> Q7: If a non-grandfathered large group market or self-insured group health plan as a pricing structure in which the plan pays a fixed amount (sometimes called a reference price) for a particular procedure, but the plan does not ensure that participants have adequate access to quality providers that will accept the reference price as payment in full, <u>is the plan required to count an individual's out-of-pocket expenses for providers who do not accept the reference price toward the individual's MOOP limit</u>?

/ / /

*Yes*. The Departments' previous guidance explained that, for purposes of PHS Act section 2707(b), a plan that utilizes a reference-based pricing design (or similar network design) may treat those providers that accept the reference-based price as the only in network providers and not count an individual's out-of-pocket expenses for services rendered by other providers towards the MOOP limit only if the plan is using a reasonable method to ensure adequate access to quality providers at the reference price.  <u>A plan that merely establishes a reference price **without using a reasonable method** to ensure adequate access to quality providers at the reference price will not be considered to have established a network for purposes of PHS Act section 2707(b)</u>. . . .

(FAQs Part 31, Q7 (emphasis added).)

176.   <u>Question 7 is a crucial statement about how ACA's annual MOOP limit applies when a plan attempts to implement reference-based pricing</u>.  At the outset, Question 7 confirms that a plan with a "pricing structure" that pays at a "fixed amount" for a specific healthcare service or procedure covered by the plan is, in fact, a "reference price."  Question 7 places no limitations on the manner in which the "fixed amount" is set. It reiterates the Agencies' "concern that such a pricing structure could be a subterfuge for the imposition of otherwise prohibited limitations on coverage, without ensuring access to quality care an an adequate network of providers."

177.   Question 7 concludes that plans that do not have a network of contracted providers and instead utilize a reference price for a given healthcare service, procedure, or item "will not be considered to have established a network for purposes of PHS Act section 2707(b)" <u>if</u> they do not "us[e] a reasonable method" to ensure access and quality.

178.   As Section J explained, Section 2707(b) is the statutory provision enacted by ACA that renders the cost-sharing limitations of Section 1302(c) – including the annual MOOP limit – applicable to self-funded group health plans like Defendants'.

179.   Now recall Section 1302(c)(3)(B)'s carve-out from the annual MOOP limit. Section 1302(c)(3)(b) excludes "balance billing amounts for ***non-network*** providers."

180.   Question 7 clarifies that a health plan that fails to utilize a reasonable method for implementing reference based pricing "will not be considered to have established a network" of quality providers who will accept payment for the procedure in question at the stated reference price.

/ / /

181.    A health plan that has not established a network for purposes of Sections 2707 and 1302 **has no non-network providers**.

182.    A health plan that has no non-network providers cannot exclude "balance billing amounts *for* non-network providers" from its the annual MOOP cost-sharing limit.

183.    And if balance billing amounts are not excluded from the annual MOOP limit, then they are subject to that limit, such that Plans must pay for all essential health benefit care incurred by plan beneficiaries and participants above the MOOP.

184.    In view of the structure and implementation of the ACA, it is entirely irrelevant that Question 7 does not actually use the phrase "balance bill." It doesn't need to. The inescapable conclusion of Question 7 – and indeed, of the Guidance as a whole – is that Section 1302(c)(3)(B)'s carve-out for "balance billing amounts for non-network providers" **simply does not apply where a plan does not use a "reasonable method" for reference-based pricing**.

185.    By definition, a reference price works by rendering the plan member personally liable for the entire amount of the hospital's charge in excess of the reference price. This acts as a powerful incentive for the patient to shop around for a hospital that will accept the reference price – assuming there is any such hospital "in-network".

186.    The entire unpaid amount of the hospital's bill in excess of the reference price is, of course, the "balance bill." As concerned commenters recognized in response to FAQs Part XIX, reference pricing without safeguards – without the use of a reasonable method – would impose tremendous, unwarranted liability on the patient (as occurred here).

**M. Defendants Are Not Excused From Their Failure to Utilize a Network of Hospitals Because They Did Not Utilize a "Reasonable" Method As Required by the Guidance**

187.    The Plan at issue did not employ any reasonable method to ensure that its "fixed" pricing methodology was not a subterfuge for the imposition of otherwise prohibited limitations on coverage.

188.    The Guidance also states that "[l]imiting or excluding cost-sharing from counting toward the MOOP . . . would not be considered reasonable with respect to emergency services" (FAQs Part 21) or subsequent post-stabilization, inpatient hospital services (FAQs Part 55, Q5.)

1  Paying for such services at a fixed price set by a plan without a network of hospitals would be

2  unreasonable because consumers rarely have a choice with respect to when and where they receive

3  such emergency care. Yet Defendants applied its "allowable claim limits" methodology to the bills

4  for inpatient hospitalization care for Patient A.  The Plan itself confirms that the "allowable claim

5  limits" are applied to all hospital bills, for all services, including for emergency and inpatient

6  hospitalization.

7        189.    In direct violation of the Guidance, the Plan failed to adopt any procedures to

8  ensure that "an adequate number of providers" are willing to accept the fixed amount paid by the

9  Plan as payment in full.  (FAQs Part XXI.)  Plaintiff is informed and believes that Defendants

10  conducted no network adequacy analysis whatsoever with respect to hospitals in the Sacramento

11  geographic region before adopting the "allowable claim limits" for hospital care.

12        190.    In direct violation of the Guidance, the Plan also failed to adopt procedures to

13  ensure that any providers willing to accept the low prices paid by the plan "meet reasonable

14  quality standards."  (*Id.*).

15        191.    In direct violation of the Guidance, the Plan failed to establish or maintain "an

16  easily accessible exceptions process" to its fixed-price methodology.  (*Id.*)

17        192.    In direct violation of the Guidance, the Plan likewise failed to disclose to

18  beneficiaries and participants:

19        &bull;   "[T]he pricing structure, including a list of services to which the pricing

20           structure applies and the exceptions process" (*id.*);

21        &bull;   "A list of providers that will accept the [Plan's fixed payment] for each service"

22           (*id.*);

23        &bull;   "A list of providers that will accept a negotiated price above the [Plan's fixed

24           payment] for each service" (*id.*); and

25        &bull;   "Information on the process and underlying data used to ensure that an

26           adequate number of providers accepting the reference price meet reasonable

27           quality standards."  (*Id.*)

28  / / /

1    193.   Defendant Plan freely admits that it did not utilize a network of hospitals that could

2 render the EHBs covered by the Plan.

3    194.   Defendants' utter failure to comply with any aspect of the Guidance, however,

4 further underscores that the Plan was not otherwise excused from its obligation to maintain a

5 network of hospitals.  By paying an intentionally low reference price for every conceivable

6 hospital service regardless of access, choice, or quality, Defendants intended to engage in a

7 subterfuge and avoid ACA's otherwise clear prohibitions on benefit limitations.

8    195.   In closing, it is worth reflecting on the exact nature of the "junk" insurance that

9 ACA outlawed.  As part of ACA's legislative history, Congress received testimony from

10 healthcare experts on needed healthcare reforms.  *See generally Healthcare Reform Roundtable*

11 *(Part I): Hearing Before the S. Comm. on Health, Education, Labor & Pensions,* 111th Cong.

12 (2009) (statement of Jonathan Gruber, Ph.D of the Massachusetts Institute of Technology).

13    196.   In his testimony, Professor Gruber urged Congress not only to abolish annual and

14 lifetime limits on health benefits, but also to

15     more broadly rule out 'mini-med' or 'indemnity' plans that don't necessarily include
   annual or lifetime limits, <u>but instead impose a reimbursement schedule to the consumer</u>
16 <u>which is well below the likely cost of the service.</u> <u>Plans which only cover, for example,</u>
   <u>$500/day towards the cost of a hospital stay place consumers at needless and unanticipated</u>
17 <u>risk.</u>

18 (*Id*. (emphasis added).)

19    197.   Congress took Professor Gruber's advice. ACA now prohibits such features with

20 respect to group health plans and health insurers.

21    198.   By adopting a plan design with no network of hospitals and no safeguards,

22 Defendants engage in precisely the sort of "subterfuge" prohibited by ACA and warned against by

23 the Agencies in their extensive Guidance.

24    199.   The Plan is therefore obligated to count all cost sharing, including Patient A's

25 balance bills for hospital services, towards the annual MOOP limitation for calendar year 2021.

26    200.   This conclusion does not depend on whether ACA "mandates" self-funded ERISA

27 plans in some ways to maintain a network of providers.  ACA was not drafted that way; it imposed

28 a new, national layer of regulation on top of the existing managed care framework, in which all

1  health plans offered networks of providers and network adequacy is regulated primarily at the state

2  level.

3        201.    What is important is whether Defendants complied with their undeniable

4  obligations to protect Patient A from cost-sharing in excess of the MOOP limit in Calendar year

5  2021, consistent with Question 7 and the Guidance as a whole.  Defendants failed to do so.

6        **N. Plaintiff Exhausted Its Administrative Remedies**

7        202.    Plaintiff pursued all levels of appeal that were available for each claim.  Each

8  appeal was met by a generic denial, upholding the Plan's decision.  Each of the appeals was

9  denied without further payment.

10       203.    Plaintiff has exhausted all its administrative remedies under ERISA.

11       204.    Further appeals would have been entirely futile. Without a single exception, each of

12 Plaintiff's appeals was denied without additional payment.

13       205.    Moreover, because Defendants failed to follow ERISA claims regulations – which

14 require that plan administrators provide the "specific reason or reasons for [each] adverse

15 determination" of benefits – all appeals must be "deemed exhausted" within the meaning of 29

16 C.F.R. § 2650.503-1(l)(1).

17       **O. The Purported One-Year Limitation Does Not Bar Suit**

18       206.    An obscure sentence buried deep within the 103-page Plan document states that

19 any lawsuit against the Plan "must be filed within one (1) year from the date all claim review

20 procedures provided for in this Plan Document have been exhausted." (Ex. A at 76.)  This

21 statement is insufficiently disclosed and, under ERISA, not enforceable.

22       207.    ERISA does not permit the enforcement of improper, undisclosed limitations on

23 benefits.  *See* 29 U.S.C. § 1022; 29 C.F.R. § 2520.102-2.  Courts routinely hold that, where a time

24 limitation on suit is not properly disclosed in the Summary Plan Description, it is unenforceable.

25 *See, e.g.*, *Spinedex Physical Therapy USA Inv. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282,

26 1294 (9th Cir. 2014) (applying 29 U.S.C. § 1022(b) to bar contractual time limitation, which was

27 "buried deep" in plan document, from being enforced against healthcare provider).  Such

28 / / /

208.     limitations "must be clearly disclosed in the SPD" in accordance with § 1022(a). *Id.* The limitation here was not.

209.     The Ninth Circuit recently explained that "ERISA's central policy goal is to protect benefit plan participants 'by requiring the disclosure and reporting to participants and beneficiaries of financial and other information . . . and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." *King v. Blue Cross & Blue Shield of Illinois*, -- F.3d. --, No. 15-55880, 2017 WL 3928339 (9th Cir. Sept. 8, 2017).  To further this goal, ERISA requires that benefit plans provide participants with an SPD and a "summary of any material modification in the terms of the plan." *Id.* (citing 29 U.S.C. § 1022(a).)

210.     Further, Section 1022 of ERISA requires that Summary Plan Description documents, like the ones at issue here, "shall be written in a manner calculated to be understood by the average plan participant."  29 U.S.C. § 1022(a).  The SPD must also "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  (*Id.*)

211.     The regulations implementing Section 1022 of ERISA unambiguously require that limitations and exclusions not be minimized or obscured:

> General format.  The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries.  Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant.  Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits.  The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations.

29 C.F.R. § 2520.102-2(b) (emphasis added).

212.     The regulations only permit limitations and exclusions to be stated in a separate place from the benefits if the SPD expressly sets forth in the benefits section the specific page where the pertinent limitations and exclusions can be found.  Specifically, the regulation instructs that "The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits,

1 | provided that adjacent to the benefit description the page on which the restrictions are described is

2 | noted." (*Id*. (emphasis added).)

3 |       213.    Under Ninth Circuit law, Plaintiff is entitled to render the one-year limitation

4 | unenforceable pursuant to its derivatively asserted cause of action, below, "to recover benefits due

5 | [] under the terms of his plan, to enforce [its] rights under the terms of the plan, or to clarify [its]

6 | rights to future benefits under the terms of the plan." *See* 29 U.S.C. § 1132(a)(1)(B); *Spinedex*,

7 | 770 F.3d at 1297 (giving healthcare provider the benefit of this rule).

8 |

9 | **FIRST CAUSE OF ACTION**

10 | **(ERISA Section 502(a)(1)(B))**

11 | (Against All Defendants)

12 |       214.    Plaintiff incorporates all allegations set forth in the above paragraphs.

13 |       215.    Plaintiff has standing to pursue benefits under ERISA Section 502(a)(1)(B)

14 | pursuant to its assignment of ERISA plan benefits from Patient A.

15 |       216.    When Patient A came to UC Davis Health to receive the services in question, she

16 | voluntarily signed and executed Plaintiff's standard form, entitled "Terms and Conditions of

17 | Service." Patient A executed some version of this form on at least four separate occasions,

18 | including, relevant to the services at issue here, on August 3, 2021.

19 |       217.    That agreement included the following language:

20 | 9. ASSIGNMENT OF BENEFITS (INCLUDING MEDICARE BENEFITS): I authorize
and direct the payments to UCDHS of any insurance benefits including hospital insurance
21 | and unemployment compensation disability benefits otherwise payable to or on my behalf
for UCDHS services, including emergency services, at a rate not to exceed those in the
22 | Charge Master in effect on the date of service. I understand that I am financially
responsible for charges not paid pursuant to this agreement. I further agree that any credit
23 | balance resulting from payment of insurance or other sources may be applied to any other
account owed to UCDHS by me.

24 |

25 |       218.    Under established Ninth Circuit precedent, this language assigning Patient A's right

26 | to benefits is sufficient to confer upon Plaintiff the right under ERISA to sue derivatively for

27 | benefits derivatively on Patient A's behalf. *See Misic v. Building Service Employees Health and*

28 | *Welfare Trust*, 789 F.2d 1374 (9th Cir. 1986).

219.   The Plan terms themselves explicitly permit assignments of benefits.  Page 32 states, "*if a **facility** or **nonpreferred provider** indicates on a Form UB or on a Form HCFA (or similar claim form) that the **facility** or **nonpreferred provider** has an assignment of benefits, <u>then the **Plan** will require no further evidence that benefits are legally assigned to that **facility** or **nonpreferred provider**.</u>*"  (Ex. A at 32 (underline emphasis added).)

220.   Accordingly, Plaintiff proceeds pursuant to its assignment of benefits from Patient A and seeks benefits under the plan.  In doing so, Plaintiff was not required to waive any rights whatsoever, such as the right to contest a payment determination or the right to balance bill Patient A.  Plaintiff never waived any of its rights under ERISA or any of its rights under the Financial Agreement and/or Terms and Conditions of Service entered into by Patient A as a condition of receiving services from Plaintiff.

221.   Every Form UB-04 billing form submitted by Plaintiff to the Plan indicated in the appropriate box that Plaintiff had obtained an assignment of benefits from the patient.  Consistent with the language of the Plan, Defendants accepted the Plaintiff's assignment of benefits.

222.   Plaintiff diligently pursued all internal appeals available under the Plan and exhausted all appeal remedies.

223.   Defendants denied each of the appeals submitted by Plaintiff.  The most recent final denial of Plaintiff's claims occurred on January 6, 2023.  All appeals have been exhausted.

224.   Defendants underpaid benefits due to Plaintiff by failing to pay 100% of the charges of Patient A's care above the $8,550 MOOP threshold for calendar year 2021.  Such payment was required by the Plan's Out-of-Pocket Expense Limit Provision, as automatically amended pursuant to the Plan provision titled "Conformity with Statute(s)."

225.   Plaintiff is entitled to benefits from the Plan, calculated as follows: the portion of the outstanding balance of $323,006.47 that is over the $8,550 calendar year limit for 2021, along with appropriate interest.

226.   Plaintiff is also entitled to its reasonable attorneys' fees under ERISA Section 502(g).

/ / /

**SECOND CAUSE OF ACTION**

**(ACA Section 2707(b) via ERISA Section 502(a)(1)(B))**

(Against All Defendants)

227.    Plaintiff incorporates all allegations set forth in the above paragraphs.

228.    Plaintiff proceeds on this cause of action under ERISA pursuant to an assignment of benefits it has obtained from the patients, as alleged above.

229.    In the alternative, and to the extent that the Plan's Out-of-Pocket Expense Limit Provision was not automatically amended pursuant to the Plan provision titled "Conformity with Statute(s)," Plaintiff seeks to enforce PHS Act Section 2707(b) through this cause of action for ERISA benefits.

230.    Section 502(a)(1)(B) permits Plaintiff, via its assignment of benefits from Patient A, "to recover benefits due [] under the terms of [Patient A's] plan, to enforce [Patient A's] rights under the terms of the plan, [and/]or to clarify [Patient A's] rights to future benefits under the terms of the plan."

231.    For all the reasons explained above, the Plan was obligated to comply with PHS Act Section 2707(b) with respect to the unpaid hospital bills at issue, and therefore to count towards the annual MOOP threshold all balance bills for Patient A's care.

232.    ERISA is an appropriate mechanism for the enforcement of the federal ACA requirements imposed on self-funded ERISA plans, including Section 2707(b).  *See King v. Blue Cross & Blue Shield of Illinois*, 871 F.3d 730 (9th Cir. 2017); 29 U.S.C. § 1185d.

233.    Plaintiff brings this cause of action in the alternative to enforce Section 2707(b)'s requirements independently of the Plan's written terms, to enforce Patient A's rights to benefits under the terms of the Plan, and to clarify Patient A's rights to benefits under the Plan and pursuant to Section 2707(b).

234.    ACA does not prohibit Patient A (or by extension, Plaintiff, who stands in the shoes of Patient A) from enforcing the requirements of Section 2707(b).  The provisions of 42 U.S.C. § 300gg-22(a), titled "State enforcement," are inapplicable because the Plan at issue is not

/ / /

"health insurance coverage" governed by state law.  Rather, the Plan is a self-funded ERISA plan that is largely exempt from state regulation.

235.     *Smith v. United Healthcare Insurance Company*, No. 18-CV-06336-HSG, 2019 WL 3238918 (N.D. Cal. July 18, 2019) is therefore distinguishable and does not prohibit Plaintiff from enforcing the requirements that PHS Act Section 2707(b) imposes upon the Plan.

236.     Pursuant to the terms of PHS Act Section 2707(b), as incorporated by amendment into the ERISA statute pursuant to Section 1185d, Plaintiff is entitled to benefits from the Plan, calculated as follows: the portion of the outstanding balance of $323,006.47 that is over the $8,550 calendar year limit for 2021, along with appropriate interest.

237.     Plaintiff is further entitled to its reasonable attorneys' fees under ERISA Section 502(g).

**WHEREFORE,** Plaintiff prays:

A.     On the First Cause of Action, for an order obligating Defendants to pay ERISA benefits the amount of $323,006.47, or alternatively, an amount to be proved at trial;

B.     On the Second Cause of Action, for an order obligating Defendants to pay ERISA benefits the amount of $323,006.47, or alternatively, an amount to be proved at trial;

C.     For an award of costs, including attorneys' fees to the full extent permitted under the law, including without limitation, pursuant to ERISA, and any other applicable law;

D.     For an award of pre- and post-judgment interest to the full extent permitted under law;

E.     An award of such other relief as the Court deems just and proper.

Dated:  November 20, 2023               ATHENE LAW, LLP

By:     _____
                    */s/ Eric D. Chan*
                ERIC D. CHAN
Attorneys for Plaintiff THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA on behalf of THE
UNIVERSITY OF CALIFORNIA, DAVIS MEDICAL
CENTER