UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| The Regents of the University of California, a California Public Trust Corporation, on behalf of the University of California, Davis Medical Center,<br><br>                Plaintiff,<br><br>    v.<br><br>The Chefs' Warehouse, Inc. Employee Benefit Plan, et al.,<br><br>                Defendants. | No. 2:23-cv-00676-KJM-CKD<br><br>ORDER |

        Plaintiff, the Regents of the University of California, on behalf of the University of California, Davis Medical Center (UC Davis Medical Center), alleges defendants, the Chefs' Warehouse, Inc. Employee Benefit Plan, Chefs' Warehouse, Inc., and doe defendants wrongfully deprived Patient A, the plan beneficiary, from benefits provided by the plan. Patient A assigned her rights to the medical center, which now assert claims against the plan. The plan moves to dismiss for failure to state a claim. The court **grants** the motion.

**I.    BACKGROUND**

        On or around August 3, 2021, Patient A received inpatient cancer surgery at the hospital known as UC Davis Medical Center. First Am. Compl. (FAC) ¶ 11, ECF No. 26. The hospital

1

1    discharged her on August 7, 2021, and Patient A received chemotherapy, radiation and other
2    related services for several months thereafter. *Id.* ¶¶ 11–12. The hospital charged Patient A
3    $397,519.31 for the treatment of her obstetric-gynecologic (OB/GYN) cancer. *Id.* ¶¶ 13, 83.
4            Patient A participated in a self-insured group health plan, meaning the employer paid plan
5    benefits directly from a fund generated in part by contributions from both the employer and
6    employees. *See id.* ¶ 30; Plan Doc., FAC Ex. A at 2, ECF No. 26-1. The plan, formally titled
7    "The Chefs' Warehouse, Inc. Employee Benefit Plan," uses a network of individual physicians.
8    FAC ¶¶ 40–45; Plan Doc. at 15. However, it does not use a network of hospitals. FAC ¶ 40. For
9    example, Patient A's primary attending physician is "in-network," *id.* ¶ 85, but the one hospital
10   where that physician practices is not in the plan's network, *id.* Individual physicians cannot
11   provide complete care and treatment for OB/GYN cancer. *Id.* ¶¶ 51, 83, 90. To receive treatment
12   for her cancer, Patient A needed hospital services. *Id.* ¶¶ 17–18, 86. However, the plan did not
13   include hospital facilities that could provide the care she needed, let alone any hospitals, in its
14   network. *Id.* ¶ 86.
15           The specific terms of the plan are detailed in the "Plan Document and Summary Plan
16   Description," which is attached to the hospital's complaint. *See* Plan Doc. According to this
17   document, benefits under the plan include 100 percent coverage of many services including
18   chemotherapy, radiation therapy, inpatient and outpatient hospital care and emergency services,
19   and other treatments after the deductible. *See id.* at 7–13. The deductible for individuals is
20   $2,700. *Id.* at 7. The plan also includes an individual out-of-pocket expense limit of $3,600,
21   which is "the most the **covered person** could pay in a year for covered services." *Id.* (emphasis in
22   original). However, the plan excludes from the out-of-pocket expense limit "expenses in excess
23   of **allowable claim limit**." *Id.* (emphasis in original). The plan defines the "allowable claim
24   limit" as "the charges for services and supplies, listed and included as **covered expenses** from a
25   **facility** or **nonpreferred provider** under the **Plan**, which are **medically necessary** for the care and
26   treatment of **illness** or **injury**, but only to the extent that such fees are within the **allowable claim**
27   **limit**s." *Id.* at 30 (emphases in original). For facilities, including hospitals, the allowable claim
28   limit is the greater of "(I) 112% of the facility's most recent departmental cost ratio, reported to

2

the Centers for Medicare and Medicaid Services ("CMS") and published in the American Hospital Directory as the "Medicare Cost Report" (the "CMS Cost Ratio"), or (II) the Medicare allowed amount for the services in the geographic area plus an additional 20%." *Id.*; *see also* FAC ¶¶ 68, 148.

In addition to the plan's individual out-of-pocket expense limit, the Public Health Service (PHS) Act, which was amended by the Patient Protection and Affordable Care Act (ACA), sets an annual maximum out-of-pocket limitation for essential health benefits. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1201, 124 Stat 119, 161 (2010). Specifically, PHS Act section 2707(b) provides: "A group health plan shall ensure that any annual cost-sharing imposed under the plan does not exceed the limitations provided for under paragraph (1) of section 18022(c) of this title." 42 U.S.C. § 300gg-6(b). In other words, a health plan must ensure a plan beneficiary's out-of-pocket costs do not exceed the cost-sharing limitation; in 2021 the maximum out-of-pocket limitation for individuals was $8,550. *See* FAC ¶¶ 224, 236. Section 18022(c)(3) of Title 42 of the United States Code, also known as ACA section 1302(c), in turn defines "cost-sharing" to include "deductibles, coinsurance, copayments, or similar charges; and [] any other expenditure required of an insured individual which is a qualified medical expense . . . with respect to essential health benefits covered under the plan." 42 U.S.C. § 18022(c)(3)(A). Cost-sharing "does not include premiums, balance billing amounts for non-network providers, or spending for non-covered services." *Id.* § 18022(c)(3)(B).

In accordance with its terms, the plan paid about a fifth of the total hospital bill, $74,512.84. FAC ¶¶ 13, 100–01. This has left Patient A responsible for the remaining $323,006.47. The hospital alleges the plan employed a controversial "reference-based pricing" model, which is when a plan sets a specific limit on how much it will pay for certain health services. *See id.* ¶¶ 21–29, 53–81. As noted, the plan set reference points as the greater of "the Medicare allowed amount plus an additional 20%; or, instead, based on an estimate of 112% of what it would have cost for the hospital to provide the service in question[.]" *Id.* ¶ 100. The hospital alleges it never agreed to be subject to this pricing methodology and no other hospital has "ever agreed up-front to accept the Plan's methodology as payment in full." *Id.* ¶ 103. Here, the

plan used the reference price based on 112 percent of the hospital's costs. *Id.* ¶ 101. Curiously, the hospital does not allege what Patient A's actual cost of care was or whether the plan paid less than that amount. *Cf. id.* ¶¶ 104–05 (alleging "Medicare rates are widely recognized to pay less than the cost of care" and hospitals "contract with major insurers at rates that are equivalent to somewhere between 250% and 400% of Medicare").

After exhausting all internal appeals with the plan's administrators, the hospital brought this action against the plan. *See id.* ¶¶ 71, 202–05, 222–23; Compl., ECF No. 1. The court dismissed the initial complaint for failing to state a claim, but granted leave to amend. Prior Order, ECF No. 25. The hospital filed an amended complaint and now alleges Patient A is entitled to benefits above the maximum annual out-of-pocket limit. FAC ¶¶ 224, 236. Patient A assigned her benefits to the hospital. *Id.* ¶¶ 9, 215–21, 228, 230. The hospital brings two nearly identical claims under the Employee Retirement Income Security Act (ERISA): 1) Patient A is entitled to benefits above the maximum annual out-of-pocket limitation under the terms of the plan and in accordance with ERISA section 502(a)(1)(B) and 2) Patient A is entitled to those same benefits under PHS Act section 2707(b)[1] based on ERISA section 502(a)(1)(B). *Id.* ¶¶ 214–37.

The plan moves to dismiss the amended complaint for failing to state a claim under Federal Rule of Civil procedure 12(b)(6). Mot., ECF No. 29. The hospital opposes, Opp'n, ECF No. 32, and the plan has replied, Reply, ECF No. 35. The court submitted the matter without oral argument. Min. Order, ECF No. 34.

## II.   LEGAL STANDARDS

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In response, the court begins by assuming the complaint's factual allegations are true, but not its legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citation omitted). The court construes all factual allegations "in the light most favorable to the nonmoving party." *Steinle v. City of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019)

---

[1] The complaint states the second claim arises under ACA section 2707(b). *See* FAC at 44. The ACA amended PHS Act section 2707.

4

1 (citation omitted). The court then determines whether those factual allegations "plausibly give rise to an entitlement to relief" under Rule 8. *Ashcroft*, 556 U.S. at 679.

Under ERISA section 502(a)(1)(B), "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan[.]" 29 U.S.C. § 1132(a)(1)(B). Thus, to state a claim for a benefit under this section, as the hospital does, it must "plead facts making it plausible that a provider owes benefits under the plan." *Elizabeth L. v. Aetna Life Ins. Co.*, No. 13-2554, 2014 WL 2621408, at *2 (N.D. Cal. June 12, 2014).

### III.  ANALYSIS

Both of the hospital's claims hinge on PHS Act section 2707(b). As noted, that section sets an annual maximum out-of-pocket limit for essential health benefits. It provides: "A group health plan shall ensure that any annual cost-sharing imposed under the plan does not exceed the limitations provided for under paragraph (1) of section 18022(c) of this title." 42 U.S.C. § 300gg-6. Section 18022(c)(3) in turn defines "cost-sharing." 42 U.S.C. § 18022(c)(3)(A). Cost-sharing does not include "balance billing amounts for non-network providers[.]" *Id.* § 18022(c)(3)(B).

The Act does not define the phrase "non-network providers." The parties disagree whether the hospital is a "non-network provider." The plan argues the hospital is a non-network provider and the balance of the bill here is not included in the cost-sharing limitation. Mot. at 7–9. The hospital argues it is not a non-network provider and the plan must pay the balance of the bill beyond the relevant limit. *See generally* Opp'n; FAC ¶ 29.

In resolving this dispute, the court begins "with the language of the statute itself." *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). Unless Congress specifies otherwise, words in statutes have the same meanings as in common use. *Roberts v. Sea–Land Servs., Inc.*, 566 U.S. 93, 100 (2012). Context also matters, both "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

The hospital is a non-network provider under both the plain reading of the statute and customary usage of that term. As this court and another district court within this circuit have

5

determined, the plain reading of "non-network provider" is a provider that is not part of a plan's network.  *See* Prior Order at 6–7; *Salinas Valley Mem'l Healthcare Sys. v. Envirotech Molded Prod., Inc.*, No. 17-03887, 2017 WL 5172389, at *4 (N.D. Cal. Nov. 8, 2017) ("Under a plain reading of those words, a hospital is a 'non-network provider' in relation to a health plan if (1) the health plan has a network of providers; and (2) the hospital is not one of those providers.").  The common usage of the term "non-network provider" or "out-of-network providers" in the health insurance context is essentially the same: providers who do not have a contract with the applicable plan.  *Cf., e.g.*, *York v. Wellmark, Inc.*, 965 F.3d 633, 641 (8th Cir. 2020) (customary meaning of "in-network providers" is providers with contracts with the applicable plan); *Franco v. Conn. Gen. Life Ins. Co.*, 647 F. App'x 76, 79 (3d Cir. 2016) (unpublished) (noting non-network providers are commonly referred to as out-of-network); *In re Out of Network Substance Use Disorder Claims against UnitedHealthcare*, No. 19-02075, 2022 WL 17080378, at *1 (C.D. Cal. Oct. 14, 2022) ("Providers are out-of-network ('non-network').").

    The hospital's complaint and the sources it cites support this interpretation.  In its complaint, the hospital uses the term "in-network" to refer to providers who contract with a plan.  *See, e.g.*, FAC ¶¶ 20, 39, 131–35.  "Out-of-network" and "non-network" are the most natural antonym to the phrase "in-network."  In addition, the agency guidance on which the hospital relies extensively, both in its complaint and opposition brief, states: "For purposes of the MOOP [maximum out-of-pocket] limit under PHS Act section 2707 and ACA section 1302(c), an out-of-network provider is a provider or facility with which the plan or issuer does not have a contractual arrangement directly or indirectly with respect to the applicable plan or coverage."  ACA FAQs Part 60 at 3[2]; *see also* Transparency in Coverage, 84 Fed. Reg. 65464-01 (Nov. 27, 2019) (same);

---

[2] United States Department of Labor, Employee Benefits Security Administration, *FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 60*, DOL (July 7, 2023), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-60.  The court can consider the agencies' FAQs cited by the hospital in its complaint under the "incorporation by reference" doctrine, *see Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 23 2005), and takes judicial notice of the agencies' other FAQs, proposed rules and final rules as they are publicly available and their contents are not disputed, *see* Fed. R. Evid. 201(b).  Plaintiffs' request for judicial notice, Req. Judicial Notice, ECF No. 32-2, is thus **granted in part** as to those agency documents the court considers in resolving this motion and

Patient Protection and Affordable Care Act; Standards Related to Essential Health Benefits, Actuarial Value, and Accreditation, 78 Fed. Reg. 12834-01 (Feb. 25, 2013) (same). The FAQs provided this definition in explaining the limits on cost sharing under the ACA and the sections relevant to the pending motion. ACA FAQs Part 60 at 3.

Here, the plan had a network of providers, and the hospital was not part of the network. FAC ¶¶ 20, 39–40. The hospital did not contract with the plan. *See* FAC ¶¶ 39–40; Opp'n at 19. It contracts with other health insurers and is "in-network" with those plans, *see, e.g.*, FAC ¶ 20, but there is no allegation the hospital was in the plan's network, such that the term "non-network provider" would not apply to it. The amended complaint does not show Congress used the phrase "non-network providers" in any unusual or unexpected way. *Cf.* Prior Order at 6. Under the plain text and common usage of the term, the hospital is a non-network provider because it is not in the plan's network and did not contract with the plan. Thus, the balance of the bill, the remaining $323,006.47, is not included in the cost-sharing limit. *See* 42 U.S.C. § 18022(c)(3)(B). The hospital cannot show the plan owes additional benefits under either the plan or the cost-sharing provision.

The hospital argues the term "non-network providers" is ambiguous in context. Its argument is rather convoluted, but it starts with a premise that is simple enough: if there is no network of providers, there can be no non-network providers. If that premise is viable, and if the hospital can show there is no network of providers within the plan, then the hospital will have shown there are also no non-network providers, which would mean the hospital itself is not a non-network provider. And if that is true, then the exception to the cost-sharing limit for balance billing amounts would not apply, and the plan could be liable.

The success of the hospital's argument thus turns on its ability to plead and prove there is not really a "network" of providers in the plan. The hospital attempts to meet its pleading burden by contending that when plans use reference pricing—as it alleges the plan does in this case—

---

**denied in part as moot** as to those documents that are not relevant to disposition of this motion. Defendants' objections to plaintiff's request for judicial notice are thus overruled. *See* Objs., ECF No. 36.

7

then they must use a reasonable method to ensure adequate access to quality providers. Otherwise, in the hospital's telling, the plan cannot truly be said to have established a network. Although there is no dispute that the plan in this case has a network of providers, the hospital alleges the plan did not use a reasonable method to ensure adequate access to quality providers, and so it did not create the kind of network required by law.

The hospital's argument is unpersuasive for several reasons. The first is the hospital's incorrect however understandable assumption that plans must use reasonable methods to ensure adequate access under the law. As before, the hospital cites no statute or regulation requiring self-funded plans to include hospitals in their networks. *See* Prior Order at 7. As the hospital itself notes, plans are "perfectly free not to contract with hospitals[.]" Opp'n at 23 (emphasis omitted). Nor does the hospital cite any statute or regulation requiring self-funded plans to use reasonable methods to ensure adequate access to quality providers or to ensure their networks meet any particular standards. In fact, Congress does not require self-funded plans to comply with network adequacy requirements. *See id.* at 20–21. Rather, Congress included a network adequacy requirement for health insurance sold on an ACA exchange. *See* 42 U.S.C. § 300gg-1(c); 42 U.S.C. § 18031(c)(1)(B); 45 C.F.R. § 156.230. Congress's decision to impose requirements in that setting suggests its omission of a similar requirement for self-funded plans was intentional. *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original) (citation omitted)). There is no basis in statute or regulation to conclude the plan's network is disqualified by virtue of any adequacy requirements.

The hospital concedes "the network adequacy regulations applicable to the Exchange do not apply" here. Opp'n at 21. Because the hospital cannot rely on any statute or regulation for this proposition, the hospital directs the court to the relevant agencies' FAQs, cited above, which are guidance documents. *See, e.g.*, *id.* at 7, 27–30; FAC ¶¶ 189–92 (alleging plan violated agencies' guidelines). An agency's guidance "that reflects an agency's 'body of experience and

informed judgment,' but that is not promulgated through rulemaking, is typically afforded *Skidmore* deference." *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).[3] Under *Skidmore* deference, the agencies' FAQs are entitled to a "measure of respect" and the court may refer to them for guidance. *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (citations omitted). "The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001).

The hospital relies on several FAQs to argue plans that engage in reference-based pricing cannot be deemed to have established a "network" unless they use a reasonable method to ensure the plan provides adequate access to quality providers in accordance with the agencies' guidance. FAC ¶¶ 153, 171–72, 198–201; Opp'n at 24. These FAQs expressed concerns about reference pricing and created guidelines for providers that utilized such models. *See* FAC ¶¶ 153–57; 171–75; *see generally* Req. Judicial Notice Exs. 2–6, ECF No. 32-3. The following FAQ exemplifies the hospital's point overall:

> Q7: If a non-grandfathered large group market or self-insured group health plan [h]as a pricing structure in which the plan pays a fixed amount (sometimes called a reference price) for a particular procedure, but the plan does not ensure that participants have adequate access to quality providers that will accept the reference price as payment in full, <u>is the plan required to count an individual's out-of-pocket expenses for providers who do not accept the reference price toward the individual's MOOP limit?</u>
>
> ***Yes***. The Departments' previous guidance explained that, for purposes of PHS Act section 2707(b), a plan that utilizes a reference-based pricing design (or similar network design) may treat those providers that accept the reference-based price as the only in-network providers and not count an individual's out-of-pocket expenses for services rendered by other providers towards the MOOP limit only if the plan is using a reasonable method to

---

[3] Although the Supreme Court has overruled *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), it has not disturbed district courts' application of *Skidmore* deference principles. *See Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262–63 (2024).

9

>
> ensure adequate access to quality providers at the reference price. <u>A plan that merely establishes a reference **price without using a reasonable method** to ensure adequate access to quality providers at the reference price will not be considered to have established a network for purposes of PHS Act section 2707(b).</u>

*Id.* ¶ 175 (emphases in original) (quoting ACA FAQs Part 31 at 9, Req. Judicial Notice Ex. 5).

This guidance does not support the hospital's position. Question seven appears in the section titled "Limitations on Cost-Sharing under the Affordable Care Act." ACA FAQs Part 31 at 8. Immediately before the cited passage, the FAQs provide a brief summary of the cost-share provision. *Id.* In that section, the FAQs note prior "FAQs clarified that if a plan includes a network of providers, the plan may, but is not required to, count an individual's out-of-pocket spending for out-of-network items and services toward the MOOP limit." *Id.* (citing in part ACA FAQs Part 18, Req. Judicial Notice Ex. 2); *see also* ACA FAQs Part 21 at 1–2, Req. Judicial Notice Ex. 4 (same). This language reflects the regulations at 45 C.F.R. § 156.130(c), which create a "Special rule for network plans." 45 C.F.R. § 156.130(c). Under that rule, "[i]n the case of a plan using a network of providers, cost sharing paid by, or on behalf of, an enrollee for benefits provided outside of such network is not required to count toward the annual limitation on cost sharing[.]" *Id.* Both parties agree section 156.130(c) does not apply to the plan because the regulations do not apply to group health plans. *See* Mot. at 19–20; Opp'n at 21, 25; 45 CFR § 156.10(b) ("This part establishes standards for QHPs [Qualified Health Plans] under Exchanges, and addresses other health insurance issuer requirements."). Although the FAQs the hospital relies on address group health plans that are not covered by the regulations noted above, the regulations provide context for the FAQs' guidance. *See, e.g.*, ACA FAQs Part 31 at 10 (noting the FAQ "addresses only group health plans' and group health insurance issuers' obligations under section 2707(b) of the PHS Act"); *see also* Opp'n at 25.

Reading these provisions together, then, the FAQs explain why a plan that includes a network of providers may count, but is not required to count, an individual's out-of-pocket spending for services provided out of network under the regulations and section 1302(c). However, any plan using reference-based pricing will not be considered to have established a

10

1  network under the agencies' guidance if the plan does not use "a reasonable method to ensure
2  adequate access to quality providers at the reference price."  ACA FAQs Part 31 at 9.  Thus,
3  while the FAQs address whether a plan is deemed to have established a "network" that will allow
4  it to not count out-of-pocket spending for out-of-network providers towards the maximum annual
5  out-of-pocket limit, the FAQs say nothing about balance billing and whether plans that use
6  reference-based pricing must cover balance billing amounts for non-network providers if they are
7  not deemed to have established a network.  Those are the relevant questions in this case, and the
8  FAQs do not answer them in the hospital's favor.  The FAQs also consistently recognize that
9  "balance billing amounts for non-network providers" are not included in the definition of cost
10 sharing.  *See, e.g.*, ACA FAQs Part 18 at 5 (Q5 noting balance billing for non-network providers
11 is not included in cost-sharing, but a plan may count such expenses towards the plan's annual
12 maximum out-of-pocket-limit).  Moreover, as noted, the FAQs define an "out-of-network
13 provider" as "a provider or facility with which the plan or issuer does not have a contractual
14 arrangement directly or indirectly with respect to the applicable plan or coverage."  ACA FAQs
15 Part 60 at 3.  While the agencies' reasoning may be persuasive in other contexts, the court finds it
16 has minimal relevance here.  Even with the agencies' guidance, the hospital cannot show it is not
17 a "non-network provider."

18      Although the court in *Salinas Valley Memorial Healthcare Systems v. Monterey Peninsula*
19 *Horticulture, Inc.*, appears to have reached a different conclusion, the court finds the decision
20 offers little guidance to this case.  No. 17-07076, 2018 WL 2445349 (N.D. Cal. May 31, 2018).
21 There, the court denied the defendants' motion to dismiss based on similar arguments raised by
22 the hospital.  *See id.* at *16.  In *Salinas Valley*, however, the defendants "[did] not squarely
23 address the complaint's allegations about plaintiff's reference price theory.  Indeed, they don't
24 say much about it at all, except that it's confusing."  *Id.* at *14.  Based on the record before it, that
25 court concluded it was "unprepared to find that plaintiff's reference price theory is completely
26 implausible, as a matter of law."  *Id.*  Here, in contrast, the plan has done more than argue the
27 hospital's theory is confusing.  The plan addresses the hospital's reference price arguments and

11

1  explains why the agencies' FAQs do not offer any relevant guidance on balance billing for non-
2  network providers.  *See* Mot. at 22–24; Reply at 10–13.

3  In conclusion, even accepting the hospital's allegations as true, the plan provided benefits
4  in accordance with the terms of the plan and the ACA.  Under the ACA, cost sharing does not
5  extend to balance billing amounts for non-network providers.  Those amounts are excluded from
6  an individual's maximum annual out-of-cost limitation.

7  This is not to say the court condones the plan's misleading language, which suggests
8  rather plainly that it will cover 100 percent of the costs after the deductible for the treatments
9  Patient A received.  The court also recognizes the use of reference pricing may undercut the
10 purpose of the cost sharing provision and expose individual beneficiaries to significant financial
11 liability and hardship.  However, given the applicable law here, the hospital has not pled and
12 cannot plead the plan owes additional benefits under the plan or the ACA.  As this court
13 concluded in its previous order, federal courts must apply the law as written, and may not rewrite
14 a statute to include provisions, even if what was omitted is "presumably by inadvertence."  *Lamie*
15 *v. U. S. Tr.*, 540 U.S. 526, 538 (2004) (quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926)).
16 "There is a basic difference between filling a gap left by Congress'[s] silence and rewriting rules
17 that Congress has affirmatively and specifically enacted."  *Id.* (quoting *Mobil Oil Corp. v.*
18 *Higginbotham*, 436 U.S. 618, 625 (1978)).  That is true even if the statute's clear terms arguably
19 undercut Congress's ostensible purposes.  *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 135
20 (2015).  So, while the court acknowledges the potential risks of abuse as illustrated by the
21 allegations here, it is for Congress to amend the statute if it deems amendment warranted to
22 achieve the right balance between accessibility to health care coverage and affordability.

23 The court grants the motion to dismiss.  In its prior order, the court granted the hospital
24 leave to amend after finding the "hospital could likely add allegations to its complaint to show
25 why the agencies' guidance reveals an ambiguity in the ACA's definition of 'cost sharing' or why
26 the agency's guidance relies on a persuasive interpretation of the ACA."  Prior Order at 11–12.
27 The hospital has now had an opportunity to add allegations and explain why the FAQs are
28 relevant.  The court finds further leave to amend would be futile as the plain text of the ACA bars

relief for the hospital based on the allegations it has been able to present to the court. Accordingly, the court declines to grant leave to amend. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

**IV.    CONCLUSION**

For the reasons above, the motion is **granted**. The complaint is dismissed without leave to amend. The Clerk of Court is directed to close this case.

This order resolves ECF No. 29.

IT IS SO ORDERED.

DATED:  August 23, 2024.

_____
CHIEF UNITED STATES DISTRICT JUDGE